681 A.2d 534

Donald E. BOOZE,

v.

STATE of Maryland.

Alan Shelton SNEAD,

v.

STATE of Maryland.

Nos. 1274, 1503, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Aug. 28, 1996.

210

Kreg Paul Greer, Assigned Public Defender, Towson, for appellant Booze.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant Snead.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for Appellee.

Submitted before WENNER, SALMON and EYLER, JJ.

WENNER, Judge.

Appellants, Donald E. Booze and Alan Shelton Snead, were each convicted by a jury in the Circuit Court for Baltimore City of two counts of first degree murder and illegal use of a handgun,[1] for which each was sentenced to two terms of life

---

1. This was appellants' second trial on these charges. *See Booze v. State,* 94 Md.App. 331, 617 A.2d 642 (1993), *affirmed,* 334 Md. 64, 637 A.2d 1214 (1994) (reversing appellants' convictions on the grounds that the trial court abused its discretion in allowing the State to reopen its case in chief at the trial's rebuttal stage).

imprisonment, plus ten years, all of which were to be served consecutively. In this consolidated appeal, appellants seek redress for what they perceive to be a plethora of errors by the judge who presided at trial. For clarity, we have re-phrased and reordered appellants' questions:

*Both Appellants*

I. Did the trial court err in overruling defense counsels' *Batson* [2] challenges to the prosecutor's exercise of certain peremptory strikes?

II. Did the trial court err in denying appellants' motions for a mistrial after a witness testified to the "drug reputation" of the defendants?

III. Did the trial court err in overruling defense objections to certain remarks made by the prosecutor in opening statement and closing argument?

*Snead only*

IV. Did the trial court err in restricting the cross-examination of a key State's witness?

*Booze only*

V. Did the trial court err in allowing the prosecutor to present photographs of the murder victims to a State's witness?

VI. Did the trial court err in denying appellant Booze his right properly to exercise his peremptory challenges?

For reasons we shall explain, we shall affirm the judgments as to Booze, vacate them as to Snead, and remand Snead's case to the circuit court for further proceedings consistent with this opinion.

## FACTS

Antonio Henderson and Isaac Durant were shot to death in the 3100 block of Woodland Avenue in Baltimore City.

---

**2.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Henderson was a drug dealer, and Durant may have been in the wrong place at the wrong time.

At trial, the State first presented Durant's fiancee, Rishardean Bennett [3]. Bennett testified that she and Durant were traversing along Woodland Avenue when Durant stopped to speak with Henderson. At some point, Bennett saw Booze [4] and Snead [5] approaching with drawn weapons. Someone told Bennett to run and she ran. After hearing shots, Bennett learned that Durant was dead.

Bennett's credibility was challenged when she acknowledged being "on the lam" for a "parole" violation from a felony drug conviction, and that she had been convicted for aggravated assault and theft. Moreover, Bennett had not informed the police of her version of events, or testified at appellants' first trial.

Michael Brooks was an eleven-year old cocaine dealer working for Henderson on the day of the shootings. Brooks testified that he observed Booze running up a path shooting, and Snead standing at an alley shooting. Brooks had initially given various inconsistent versions of the incident, which he attributed to being "scared." Brooks acknowledged that he was facing three counts of attempted murder, and would be tried by the same person prosecuting the case at hand. The prosecutor purportedly warned Brooks that if he changed his story, he might also face charges of perjury and contempt.

Henderson's nephew, Perry Knight, who had been convicted of conspiracy to distribute controlled substances and unauthorized use, testified that he saw Booze fire at his uncle. Before firing, Booze signalled to a person standing some distance away, who also fired at Henderson. Knight subsequently returned fire at Booze "five times." Although Knight testified he had seen Snead in the vicinity earlier, Knight could not

---

3. Bennett's street name is "Peanut."

4. Booze's street name is "Butt–Butt."

5. Snead's street name is "Cookie Man."

identify him as the second shooter. Knight acknowledged that he had not initially approached the police with his version of events because he too was scared.

Jacquetta Jones had known both Booze and Snead for some time. She testified that she observed both appellants brandish handguns, and that Snead had fired his weapon. According to Jones, Snead began running and calling after Booze, who displayed his weapon while crossing the street.

Baltimore City Police officer Nicholas Constantine was in a marked cruiser patrolling the area when a young man ran up and directed him to the 3100 block of Woodland Avenue. As he approached the area, Constantine observed Snead and three or four other men running. According to Constantine, Snead stopped and said, "I didn't have anything to do with that." Just then, Constantine heard shots ring out. Snead then said, "you see, they're still shooting." Constantine then drove to the 3100 block of Woodland Avenue, where he found the bodies of Durant and Henderson. A fully-loaded .22 caliber revolver was found beside Henderson. Constantine also testified that Snead and his companions did not appear to be armed, but explained that he had seen them only briefly because he heard gunfire within a moment of Snead's first statement.

After being arrested, Snead said that although he was in the area and heard gunfire, he did not know from whence it came.

## I.

Appellants first contend that the trial court erred in overruling their *Batson* challenges to the State's striking two African–Americans from the panel. The first was a female (the first juror), who was No. 14 on the initial panel, and provisionally seated as juror No. 2. She was struck by the State's fourth peremptory challenge. The second was a male (the second juror), who was No. 126 on the initial panel, and provisionally seated as juror No. 1. He was struck by the State's sixth peremptory challenge.

■ According to the State's brief, this issue has not been preserved for our review, as defense counsel declared the jury ultimately impaneled "acceptable." *See Gilchrist v. State,* 340 Md. 606, 618, 667 A.2d 876 (1995) ("When a party complains about the exclusion of someone from or the inclusion of someone in a particular jury, and thereafter states without qualification that the same jury as ultimately chosen is satisfactory or acceptable, the party is clearly waiving or abandoning the earlier complaint about that jury").

The State is wrong. Just prior to opening statements, the following colloquy ensued:

COURT CLERK: Is the panel and alternates acceptable to the Defendant 1?

DEFENSE COUNSEL 1: Subject to previous reservations.

COURT CLERK: Is the panel and alternates acceptable to Defendant 2?

DEFENSE COUNSEL 2: Subject to my prior objections.

■ We nevertheless agree with the State that Booze has failed to preserve a *Batson* challenge to the first juror being stricken, as counsel for Booze did not join in Snead's objection to striking that juror. Md. Rule 8–131(a). *Cf., Stockton v. State,* 107 Md.App. 395, 396, 668 A.2d 936 (1995), *cert. denied,* 342 Md. 116, 673 A.2d 707 (1996) ("On the appellate shore, moreover, there is, with each passing year, noticeable erosion of the preservation requirement and the dike is in need of constant repair").

■ After Snead's counsel had presented a *prima facie* case,[6] the following ensued:

THE STATE: And the other black female—I don't remember which one that was. I'm not really sure—I'm not really sure who she was. But, anyway, the reason for [striking her]—

---

6. This threshold issue was not contested below.

THE COURT: Well, I know she was young. If I recall correctly, that one and [sic] had on a pair of blue jeans, stone-washed jeans if I'm right on that. I can't remember the number.

At any rate, any response, [counsel for Snead]?

COUNSEL FOR SNEAD: Yes. I don't think pregnancy is a woman [sic]—a reason to keep a woman off of a jury, nor do I think chewing gum is. What they said after they were excused by [the State] has nothing to do with the reasons why they were excused.

THE COURT: Your motion is denied.

It is clear from the record that the trial court failed to afford the State an opportunity to "tender"[7] a race neutral reason for striking the first juror. Hence, we shall remand the Snead case for the limited purpose of permitting the State to explain why it had struck the first juror, provided it is able to do so. *See, e.g., Mejia v. State,* 328 Md. 522, 541, 616 A.2d 356 (1992) ("... [S]hould it appear that there is no reasonable possibility that the circumstances surrounding the striking of [the disputed juror] can be reconstructed fairly, then a new trial may be required and the trial judge may order one").

■ As to the second juror, the following exchange occurred:

COUNSEL FOR BOOZE: Yes. Your Honor, this is also on a *Batson* challenge. I noticed that that juror was also somebody who had never been asked to come up here. No questions were asked of him. He didn't make any noises. He wasn't—

THE STATE: I didn't—

COUNSEL FOR BOOZE: —chewing gum. He was a black male.

THE COURT: State, wait a minute. Let him finish.

---

7. *Cf., Purkett v. Elem,* —— U.S. ——, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) ("If a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination") (citations omitted).

THE STATE: All right, Your Honor.

COUNSEL FOR BOOZE: I think that the pattern has become a little more clear, that it is leaning towards black jurors.

THE COURT: [Counsel for Snead]?

COUNSEL FOR SNEAD: I join the motion. I agree.

THE COURT: All right. State?

THE STATE: Your Honor, I did not like his attitude towards me. I made certain observations of him, because, at first, I thought he would be good, because I thought he would be a strong foreman. I always pay attention to the first juror, because a lot of times they're going to be a foreman. But there were some things about him and the way he interacted with me that were negative. So, that's why I took him off, especially because he's going to be sitting next to me for a whole week or more.

THE COURT: [Counsel for Booze]?

COUNSEL FOR BOOZE: I think that in the *Batson* challenge the State is obliged to articulate a reason beyond mere feeling. Since the State hasn't done that, I'll renew the motion.

THE COURT: He was black, which the record should show he was a black male. All right. [Counsel for Snead]?

COUNSEL FOR SNEAD: I would join in what [counsel for Booze] said. I would—

THE COURT: I cannot hear you.

COUNSEL FOR SNEAD: I would join in what [counsel for Booze] said. I don't think that saying that you have a bad vibe, the State could sit here forever and get around *Batson* with every juror. And I'm unaware of when a State's Attorney and a juror would interact prior to the beginning of a trial. [Counsel for the State] said she didn't like the interaction. It's my understanding there should be no interaction at this point.

THE STATE: Your Honor, may I speak?

THE COURT: Yes.

THE STATE: His body language, his looking—the way he looked at me and his attitude towards me indicated that he was closed. I don't want a prejudiced juror. I just want a jury that's open. If there's anybody on the jury who by anything the way they interact with me communicates that they are closed to me, then I'm going to remove them.

THE COURT: His demeanor was subtle?

THE STATE: (No verbal response.)

THE COURT: It was?

THE STATE: (No verbal response.)

THE COURT: Your motion is denied.

As we recently observed in *Ball v. Martin*, 108 Md.App. 435, 450, 672 A.2d 143 (1996),[8] "the apparently broad scope of *Batson* has been severely constricted by recent cases." *See, e.g., Purkett v. Elem*, —— U.S. ——, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam); *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Indeed, "*Purkett* ... appears to us to change drastically the impact of *Batson* by appearing to limit seriously the power of appellate courts to address the findings of trial courts in respect to the second step when that court is confronted with, and accepts, facially neutral reasons for the strikes, at least as far as the federal constitution is concerned." *Ball*, 108 Md.App. at 450–51, 672 A.2d 143 (footnote omitted).

Writing for us in *Ball*, Judge Cathell concluded:

In a practical sense, if, after the party opposing the strike has presented a *prima facie* showing, the proponent thereof proffers a facially neutral reason *that is accepted by the trial court*, then an appeal on *Batson* principles has little, if any, chance of success, given that the credibility of the

---

**8.** Curiously, this case is captioned erroneously as *"Hall v. Martin"* in the Maryland Appellate Reports, but is nevertheless captioned correctly in the Atlantic Reporter.

proponent offering the reason is, as it is generally, for the trial court—not an appellate court—to determine.

*Ball,* 108 Md.App. at 456, 672 A.2d 143.

Consequently, we shall not disturb the trial court's *Batson* ruling as to the second juror.

## II.

■ Appellants next contend that the trial court erred in denying appellants' motions for a mistrial after a witness testified to the defendants' "drug reputation." During Bennett's cross-examination, the following ensued:

COUNSEL FOR SNEAD: Who was standing on the curb?

BENNETT: If I'm not mistaken, this one right here was standing on the curb—

Q: Indicating for the record, Mr. Snead.

And then you're saying Mr. Booze would have been on the pavement?

A: Right. It wasn't close range but I knew who these guys was because at the time I was—

Q: Okay, ma'am.

THE COURT: Wait a minute. Let her finish.

COUNSEL FOR SNEAD: It's non-responsive. There was no question as to how she knew them at that time, Judge.

BENNETT: Okay.

THE COURT: Wait just a minute. Ma'am, finish your answer.

BENNETT: Okay. Like I was saying, it wasn't—it wasn't close up but I knew who these guys was *because of the type of drug reputation they had.* You see what I'm saying?

Defense counsel joined in a chorus of motions to strike, and the trial court promptly gave the following curative instruction:

The jury will disregard the comment about she knew the drug reputation they had. Ma'am, don't say that anymore.

The trial court subsequently denied motions for a mistrial.

We need look no further than *Rainville v. State,* 328 Md. 398, 614 A.2d 949 (1992), in which the Court of Appeals reiterated the factors to be considered in determining whether mistrial is required under such circumstances:

whether the reference to [the inadmissible evidence] was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; [and] whether a great deal of other evidence exists. . . .

*Rainville,* 328 Md. at 408, 614 A.2d 949 (quoting *Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800 (1984)).

Suffice it to say that, following our own careful review of the record, based on Bennett's single, isolated, unresponsive response to defense questioning, mistrial was not warranted. In view of the State's case neither rising nor falling on Bennett's testimony, the curative instruction was sufficient to preserve a fair trial.

### III.

Appellants next contend that the trial court erred in overruling defense objections to certain comments the State made during its opening statement and closing argument.

■ As have appellants, we will first address the comments complained of in the State's closing argument. In closing, the State said, among other things:

Ladies and gentlemen [of the jury], we also know that there were several other people out there that night, and that *no one has come forward and said that this didn't happen.*

Counsel for appellants strenuously objected, seeking mistrial on the grounds that the State had transferred the burden of

proof to appellants. The trial court denied the motions for mistrial, and promptly gave the following curative instruction:

Members of the jury, the State sort of, not quite, implied that there might be some responsibility for the defendant to bring evidence in, or what have you. The defendant, and I've told you this at least a half dozen times, has absolutely no burden of proof, and to the extent that that was an implication, then that was wrong and [the State] won't do that again. I don't think [the State] meant to do that. It may have been misspoken on [the State's] part.

But, remember this, these defendants have no burden of proof whatsoever, and that's from the beginning of the trial to the end of the trial. The burden of proof is on the State to prove the defendants guilty beyond a reasonable doubt if the State can.

"The rule is that reversal is warranted if 'it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused.'" *Rheubottom v. State,* 99 Md.App. 335, 342, 637 A.2d 501, *cert. denied,* 335 Md. 454, 644 A.2d 488 (1994) (citations omitted). In the case at hand, we are satisfied that the curative instruction eliminated any reasonable possibility that the jury was either misled or prejudiced by the comments.

Snead also complains of the State's mentioning one Dante Jones, who had testified only at the first trial, as "arguing facts not in evidence." We disagree. At trial, counsel for Snead said:

I join that objection, except to the extent I believe that the two young men were identified as Michael Brooks and Dante Jones, *and various witnesses did identify them both as selling drugs for Henderson. That's been the only mention of Mr. Jones that would merit any mention that [sic] closing argument.*

There was no error.

■ Snead also objected to the State's following statement:

In addition, [Rishardean], she called, and I don't know about you, *but I believe she was truthful when she said* I wanted to—

Snead believes the prosecutor's interjecting her opinion as to Bennett's credibility was "out of bounds." We agree. Neverthe-less, in *Hairston v. State*, 68 Md.App. 230, 240, 511 A.2d 73, *cert. denied*, 307 Md. 597, 516 A.2d 567 (1986), although we agreed with appellant's argument that "under the law, witnesses that testify for the State are assumed to be telling the truth is improper argument," we went on to "hold that the court's error in permitting the statement was harmless beyond a reasonable doubt," citing *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976). Or, put another way, "not every improper comment made during closing argument requires reversal[.]" *Clarke v. State*, 97 Md.App. 425, 432, 630 A.2d 252 (1993) (citation omitted).

We need not linger long over Snead's contention that the State improperly appealed to the jury's desire to protect the community. Snead is wrong once more. *See Wilhelm v. State*, 272 Md. 404, 431–38, 326 A.2d 707 (1974) (citing various cases for the proposition that such comments are within the permissible scope of argument to the jury).

We next address Snead's contention that the State "strongly implied, contrary to this Court's teaching in *Clarke*, that defense counsel had misled the jury concerning the evidence, and improperly emphasized that there had been a previous trial of this case, *see Coffey v. State*, 100 Md.App. 587, 642 A.2d 276 (1994)."

The comments complained of follow:

THE STATE: ... Now, he says, [counsel for Booze] says that Perry Knight and Terika Hood killed [Henderson] for a territory. But he has not offered you a shred of evidence on that point.

COUNSEL FOR BOOZE: Objection.

THE COURT: Overruled.

THE STATE: Keep in mind, the Judge told you that our arguments are not evidence. What I'm saying to you, what they said to you are [sic] not evidence. If anything, we're just a guide. What evidence has he offered to you to support that comment?

COUNSEL FOR BOOZE: Objection.

THE COURT: Overruled.

THE STATE: And if we were in the process of prosecuting two innocent men, certainly, somehow or another—for example, they say, oh, the witnesses' testimonies have changed. But when you go through the evidence, you're not going to have any transcript from any trial which shows that these witnesses lied. They didn't say anything different from this trial *that they said in the first trial,* and you're not going to have that before you, because that didn't happen.

COUNSEL FOR BOOZE: Objection.

THE STATE: Now, at times—

COUNSEL FOR BOOZE: Objection.

THE COURT: Overruled.

THE STATE: [Counsel for Booze and Snead] *have tried to read things in certain ways, and then they'd leave off parts to try to make you think—*

COUNSEL FOR SNEAD: Objection.

THE STATE: —the way they did.

COUNSEL FOR BOOZE: Your Honor?

THE COURT: Overruled.

We see differently Snead's complaint that the State had implied that the defense misled the jury as to the evidence. The State did not imply "that defense counsel has suborned perjury or fabricated a defense." *Clarke,* 97 Md.App. at 431, 630 A.2d 252 (citation omitted). As we have observed, " 'closing argument is a robust forensic forum wherein its practitioners are afforded a wide range for expression.' " *Id.* (citation omitted). In fact, "The trial judge has wide discretion with respect to what counsel may say during closing argument . . .

and the trial judge's exercise of that discretion will not be disturbed unless clearly abused and prejudicial to the defendant." *Id.* at 431–32, 630 A.2d 252 (citations omitted). There was neither abuse of discretion nor prejudice.

As for Snead's claim that the State, in its rebuttal closing argument, improperly referred to appellants' first trial, Snead has not preserved that issue for our review. In any event, we agree with the State that counsel for Snead "opened the door" in his closing argument by referring to testimony from Snead's previous trial.

We will now address the complained of comments in the State's opening argument.

Snead protests that the State improperly flattered the jury:

> THE STATE: The other thing I want to say is this. I didn't pick anybody for any reason other than I thought you could all be open-minded, and I personally wanted a mature jury. I wanted people who had
>
> COUNSEL FOR SNEAD: Objection.
>
> THE STATE: —lived life—
>
> THE COURT: Overruled.

We shall dwell on this point only long enough to observe that if we were to hold that a litigant's attempt to charm a jury constitutes reversible error, we would have time for little else.

Having already disposed of Snead's complaint of the State's appealing to community protection, we will now address Snead's complaint of the State's analogy to the doctrine of *res ipsa loquitur* —"the facts of the case would speak for themselves." According to Snead, this concept is "clearly at odds with the State's burden of proof beyond a reasonable doubt." Once again, we see it differently. The trial court carefully instructed the jury as to the State's burden of proof.

Consequently, we are confident that the complained of analogy neither misled nor prejudiced the jury.[9] *Rheubottom, supra.*

■ Firing a final volley at the State's opening statement, Snead complains that "the State launched into an implication that there were plenty of additional witnesses who could prove the defendant's guilt, but that they did not come forward out of fear; the State's promise that this would be established by evidence never came true[.]" We again look to the record:

THE STATE: Now, some—Antonio Henderson had a 22–caliber handgun near one of his hands. However, that handgun had not been fired at all. So, I need to tell you that, and these two men were no longer interacting with these two men when this incident occurred. I also hate to tell you this, but it's true. When this occurred, there were people on the street, and only by the grace that no one else was killed.

COUNSEL FOR SNEAD: Objection.

THE COURT: Overruled.

THE STATE: So, that, ladies and gentlemen, is the case. These houses were occupied, there were people on the street, Homicide got right there and got the case. Now, you have to remember that this was a sudden thing, and *we had some difficulty in initiating work for witnesses—*

COUNSEL FOR BOOZE: Objection.

THE COURT: Overruled.

THE STATE: You will hear about it. But I want you to know that this is not TV. This is real life, and the people that are witnesses to this saw two young men gone, *and you can understand why they weren't willing—*

COUNSEL FOR BOOZE: Objection.

THE COURT: Overruled.

THE STATE: *—to just go leaping in the hands of the police in front of a whole lot of people.*

---

**9.** Perhaps it would be apt for more litigants to let the facts "speak for themselves."

Alas for Snead, only counsel for Booze objected to the precise statement of which Snead now complains, perhaps "by way of appellate afterthought." *State v. Wilson,* 106 Md.App. 24, 29, 664 A.2d 1, *cert. denied,* 340 Md. 502, 667 A.2d 342 (1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 2521, 135 L.Ed.2d 1046 (1996). In short, Snead has again not preserved the issue for our review.

## IV.

Snead further contends that the trial court erred in restricting his cross-examination of Michael Brooks, a key State's witness. The complained of exchange follows:

COUNSEL FOR SNEAD: Mr. Brooks, in 1991 you testified that Mr. Booze and Mr. Snead were the shooters in this incident, correct?

BROOKS: Yes.

Q: You now face charges of your own next Tuesday in this court, correct?

A: Yes.

Q: Aren't you afraid that if you now say that Mr. Booze and Mr. Snead were not the shooters it will effect [sic] your case on Tuesday?

A: No.

THE STATE: Objection.

THE COURT: He answered. You have to be quicker. The bell rung. You cannot unring it. He said no. Next question.

COUNSEL FOR SNEAD: Are you aware what the penalty for attempted murder is?

THE STATE: Objection.

THE COURT: Sustained.

As Snead sees it, the trial court erred in denying him an answer to the last question. Once more, we see it differently. Counsel for Snead was earlier allowed to elicit from Brooks that Brooks was facing three counts of attempted murder. Moreover, Brooks said that he was not "afraid" of the impact

of his testimony on his own case. In sum, Snead was afforded ample opportunity to explore Brooks's potential bias. There was no abuse of discretion. *See Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974 (1996) ("The general rule is that the extent to which a witness may be cross-examined for the purpose of showing bias rests with the sound discretion of the trial judge").

## V.

■■■ Booze contends that the trial court erred in allowing the prosecutor to exhibit to Bennett photographs of the murder victims, causing her to cry in the jury's presence, and requiring a recess to allow Bennett to compose herself. The photographs complained of are autopsy photographs which the Court of Appeals has said recently are admissible even when a defendant stipulates to the facts the photographs are offered to prove. *State v. Broberg,* 342 Md. 544, 554, 677 A.2d 602 (1996) (discussing *Evans v. State,* 333 Md. 660, 637 A.2d 117, *cert. denied,* —— U.S. ——, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994)).

In admitting the photographs, the trial court opined:

"She's not trying to do [anything] with these right now but *identify* them. When we get to that other bridge, we might have another problem. Tag them, Madam Clerk, show them to her, objection overruled.[10]

"In every homicide case, the State must establish the identity of the person killed." *Broberg,* 342 Md. at 561, 677 A.2d 602 (citation omitted). Moreover, "the general rule regarding admission of photographs is that their prejudicial effect must not substantially outweigh their probative value." *Id.* at 552, 677 A.2d 602 (citations and footnote omitted).

In this context, the question is not whether the photographs were prejudicial, but whether they were *unfairly* prejudicial.

---

**10.** After the trial court carefully reviewed the photographs, over objection, they were subsequently admitted into evidence and handed to the jury.

*Id.* at 561, 677 A.2d 602. Again, there was no abuse of discretion.

## VI.

██ Booze finally complains that the trial court erred in obtaining a list of additional potential jurors after the initial array had been exhausted, but before Booze had exhausted his peremptory challenges, in that the trial court "diluted [Booze's] use of his 20 peremptory challenges." [11]

Md. Rule 4–312(f) provides:

"**Additional Jurors.**—When the number of jurors of the regular panel may be insufficient to allow for selection of a jury, the court may direct that additional jurors be summoned at random from the qualified jury wheel and thereafter at random in a manner provided by statute."

Md. Rule 4–312(g) provides:

"**Designation of List of Qualified Jurors.**—Before the exercise of peremptory challenges, the court shall designate from the jury list those jurors who have qualified after examination. The number designated shall be sufficient to provide the number of jurors and alternates to be sworn after allowing for the exercise of peremptory challenges pursuant to Rule 4–313. The court shall at the same time prescribe the order to be followed in selecting the jurors and alternate jurors from the list."

After the array had been exhausted, counsel for Booze said:

Your Honor, I'll make the argument that I think that the Court of Special Appeals and the Court of Appeals when and if they do take a look at this question will have to see it in the light of preemptory [sic] challenges; not necessarily strikes for calls, I would admit are independent of how many panels you bring in here.

---

11. Booze had ten peremptory strikes remaining when the array was exhausted.

It's the preemptory [sic] challenge that is jeopardized, because we're given the jury list and before we begin to choose a panel, because we're given the opportunity to take a look at the jurors prior to actually choosing independent jurors three times; once when the jury panel is sworn altogether as the jury pool, then, again, we're able to take a look at them when there's a roll call, and then, again, during the voir dire. Those three times we're given the opportunity to exercise our judgment in regard to the preemptory [sic] challenges.

Now, we do the individual voir dire, but we're also able to take a look at each individual juror in the jury pool, and because we have to decide who we're going to strike based upon those introductions to the jury, we're doing it based on that jury alone. We can't compare jury numbers to anything other than the pool that we're given.

Now, if we're expected to make intelligent choices on our preemptory [sic] challenges, we're expected to make it on that pool. If we are told that it is going to be larger than this group of people, then we should have the opportunity to take a look at that larger group of people prior to exercising any preemptory [sic] challenges.

On this case, I've had to exercise 10 strikes out of my 20 already, but it's 10 strikes out of only approximately half of the pool that I would have chosen that I have to choose from. Since that's so, then I would not be able to use my preemptory [sic] challenges intelligently. I don't know who the other people are. I have had no opportunity to voir dire them either individually, or through introduction, or through getting the jury list.

So, I've had no choices with these people that we're going to see now as I have had before. So, what I am saying is that the challenges that I'm going to use now are more limited than the 20 I had before, and, since it's so, I think we've got to start out altogether with listing the jurors that we've chosen, go back to 20 strikes apiece and have a little margin of jury pool [sic] for us to be able to exercise our preemptory [sic] challenges again.

In responding, the trial court said counsel's argument "as to prejudice is esoteric at best. The Court finds that there is no prejudice."

We agree with the State that, at first glance, Booze appears to be correct. *See Dean v. State,* 46 Md.App. 536, 547, 420 A.2d 288 (1980), *cert. denied,* 289 Md. 735 (1981) ("... [T]he right of comparative rejection is an important aspect of the right to peremptory challenges ..."). *See also Spencer v. State,* 20 Md.App. 201, 208, 314 A.2d 727 (1974) ("The right to reject need not be exercised in the dark, but is, under [certain] circumstances ... a right of informed and comparative rejection").

In *Dean,* at a pre-trial conference "a few days before" the trial began, Dean's counsel was afforded eighty peremptory challenges and the State forty. Thus, when the trial began with an array of but 101 prospective jurors, grade school arithmetic foreshadowed what was to follow. With twelve jurors seated but not sworn and but two remaining, the defense "fully [insisted] on taking the 80." *Dean,* 46 Md.App. at 541, 420 A.2d 288.

At that point, the trial was postponed to another date. When trial resumed, counsel were presented "with a list of additional prospective jurors containing 48 names." *Id.* at 544, 420 A.2d 288. As the trial court believed there was "no prejudicial irregularity in the proceedings," defense counsel's objections were overruled. *Id.* at 545, 420 A.2d 288.

On appeal, we took a different view. Applying the doctrine of "informed and comparative rejection" articulated in *Spencer, supra,* the *Dean* Court wrote:

We think, however, that when the list of 101 venire [persons] was exhausted before the defense had exercised its agreed upon peremptory challenges, the court should have granted appellant's challenge to the "second" panel of prospective jurors and commenced the selection process anew with a sufficient number of prospective jurors to allow the parties to exercise the peremptory challenges permitted by the [applicable rule].... [T]o require the remaining chal-

lenges to be made from a hitherto unknown list of prospective jurors deprived the appellant of the right of "informed and comparative rejection[,"] *Spencer v. State, supra,* at 208, 314 A.2d 727, and to that extent impaired his right to the use of peremptory challenges. Such impairment, we think, requires that the judgments in this case be reversed as a denial of due process. *Spencer v. State, supra; see also Swain v. Alabama,* 380 U.S. 202[, 85 S.Ct. 824, 13 L.Ed.2d 759] (1965), where the Supreme Court recognized that the right of comparative rejection is an important part of the right to peremptory challenges and that, "the denial or *impairment of the right* [to challenge] is reversible error without a showing of prejudice."

*Dean,* 46 Md.App. at 546–47, 420 A.2d 288.

We believe the *Dean* court not only misread *Swain,* but was overly zealous in extending *Spencer.* Although in *Swain* the Supreme Court held "The denial or impairment of the right [to challenge] is reversible error without a showing of prejudice," *Swain,* 380 U.S. at 219, 85 S.Ct. at 835 (citations omitted), the doctrine of "informed and comparative rejection" was not mentioned. Indeed, it appears that *Spencer* was the genesis of that doctrine, with *Dean* its only apparent progeny.[12]

The defendant in *Spencer,* elected to use his three remaining peremptory challenges to strike "the first three of the next four persons whom he rightfully expected to be called. . . ." *Spencer,* 20 Md.App. at 208, 314 A.2d 727. For reasons

---

12. *But see Couser v. State,* 36 Md.App. 485, 496, 374 A.2d 399 (1977), *affirmed,* 282 Md. 125, 383 A.2d 389 (1978), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978) (although not citing to *Spencer,* the *Couser* court rejected appellant's argument that "had he been advised at the outset of the proceedings the State was to call [a particular witness], he would have requested a more detailed *voir dire* of the prospective jury panel, and would certainly have been able to better employ the use of his peremptory challenges"). Couser unsuccessfully attempted to relitigate the issue via post-conviction proceedings, complaining there that "the State, by failing to disclose a potential witness, 'effectively denied him the right to an informed [sic] comparative rejection.' " *Couser v. State,* 52 Md.App. 81, 82, 87, 447 A.2d 105 (1982).

unknown, the jury clerk then skipped three names before calling the next prospective juror. In reversing *Spencer* and remanding it for a new trial, Judge Moylan wrote:

Had [the defendant] known that he was comparing the three persons challenged with some other fourth person further down the list, he might well have preferred one, or more, of the rejected threesome to the unanticipated fourth. He was thus affirmatively misled in his three decisions to reject.

*Id.*

 Although prejudice need not be shown when peremptory challenges have been impaired, we do not find this to be such a case. Contrary to *Spencer, supra,* appellant was not "affirmatively misled" in any "decision[ ] to reject." Moreover, we agree with the State that Booze's claim must fail simply because he had not exhausted his peremptory challenges when the jury was seated and the case proceeded to trial. *See Spencer,* 20 Md.App. at 209, 314 A.2d 727 ("In the wise expending of his available peremptory challenges, a defendant is entitled to the expectation that the rules which have, in practice, been operating will not strangely cease to exist *once his options have been exhausted* ") (emphasis added).

To hold that a party has not received the process he or she is due each time an array has been exhausted prior to the party's exercising all of his or her peremptory challenges, we believe goes too far. To the extent that *Dean* suggests otherwise, it is hereby overruled.

In the case at hand, the trial court handled a difficult situation as best it could, "clos[ing] down the other seven felony courts in [Baltimore City]" in a search for qualified jurors. Although we acknowledge that there may be circumstances under which a trial court's failure to observe the doctrine of informed and comparative rejection may constitute reversible error, this is not such a case.[13]

---

13. In his brief, Booze, again "by way of appellate afterthought," *Wilson, supra,* contends that Md. Rules 4–312(f) & (g) were violated.

JUDGMENT AS TO APPELLANT BOOZE AFFIRMED; JUDGMENT AS TO APPELLANT SNEAD VACATED, AND CASE REMANDED WITHOUT AFFIRMANCE OR REVERSAL TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS AS TO APPELLANT BOOZE TO BE PAID BY APPELLANT BOOZE.

COSTS AS TO APPELLANT SNEAD TO ABIDE THE RESULT OF THE REMAND.

---

Although Booze has not preserved the issue for our review, we perceive no contravention of the applicable rules. We also note that, in Maryland, voir dire's purpose is to obtain a fair and impartial jury—not a jury preferred by one side or the other. While constitutional due process may apply to the exercise of peremptory challenges, there is a body of constitutional thought that ascribes no independent constitutional foundation upon which peremptory challenges are based.