688 A.2d 941

**Robert GOREN, Individually, etc.**

v.

**UNITED STATES FIRE INSURANCE COMPANY, et al.**

**No. 791, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 6, 1997.

Leonard A. Orman, Baltimore, for appellants.

Donna M. Larkin (Bendos, Drechsler, Larkin & Waters, P.C., on the brief), Baltimore, for appellee, Fire Ins. Co.

Thomas F. McDonough, Towson, for appellee, Genstar.

C. MacNair Speed, on the brief, Baltimore, for appellee, Elaine Moss.

J. Joseph Curran, Jr., Attorney General, and Omar V. Melehy, Assistant Attorney General, on the brief, Baltimore, for appellee, State of Maryland.

Argued before FISCHER, HARRELL and HOLLANDER, JJ.

HOLLANDER, Judge.

Barbara Goren was killed on June 8, 1992, after the car she was driving crossed from the left lane of northbound Interstate 83 onto the southbound lanes, and was struck by an oncoming car.[1] Her husband, Robert Goren, appellant, brought suit in the Circuit Court for Baltimore City, individually and as personal representative of Ms. Goren's estate, claiming that Elaine Moss, appellee, caused the accident by negligently operating her motor vehicle, which encroached into the decedent's lane and forced Ms. Goren off the highway. Appellant also sued United States Fire Insurance Company ("United"), appellee, under the Gorens' uninsured motorist

---

[1] In appellant's brief, the decedent is referred to as "Deborah" Goren, although her name appears as "Barbara" in the Second Amended Complaint and throughout the record extract. Additionally, the complaint alleges that the accident occurred on July 8, 1992, but the Maryland State Police Report indicates that it occurred on June 8, 1992.

coverage, asserting, alternatively, that a phantom driver caused the accident. Additionally, appellant sued Genstar Stone Products Company ("Genstar"), appellee, claiming its negligent grading of the shoulder of the interstate caused Ms. Goren to lose control of her car when she swerved to avoid the other vehicle. Genstar filed a third party complaint against the State Highway Administration (the "SHA"), appellee, claiming it had constructed the roadway according to SHA's specifications.[2] After a jury found all defendants not liable, and Ms. Goren contributorily negligent, appellant brought this appeal, positing three questions for our review, which we have re-ordered:

I. Did the court err by allowing a non-expert witness to render opinions regarding the causes of the traffic accident which he did not witness and to be cross-examined beyond the scope of his direct examination?

II. Did the trial court err in allowing all four appellees, whose interests were found to be adverse, to then combine together and exercise their peremptory challenges as a group concerted effort rather than separately?

III. Did the trial court err in permitting an accident reconstructionist to testify regarding opinions outside his scope of expertise?

We answer the first question in the affirmative; the trial court erred in permitting appellees to elicit "expert opinions" from a lay witness. Thus, we shall reverse and remand for a new trial. For the guidance of the trial court on remand, we shall consider appellant's second issue. Although the court properly found that the appellees had adverse interests and were thus entitled to additional jury strikes, we conclude that the court erred in permitting defense counsel to confer in the exercise of their peremptory challenges. We decline to address the third question.

---

**2.** SHA and United also noted cross-appeals, but voluntarily dismissed them.

### Factual Summary [3]

On the morning of June 2, 1992, Barbara Goren was driving her car in Baltimore County, northbound on Interstate 83, when she was fatally injured in a car accident. Martin Droney, a telephone company employee, was driving in the same lane as Ms. Goren, approximately three cars behind her. Earl Harmon, a truck driver, was behind Droney. Both men testified at trial about the events that they witnessed.

According to Harmon and Droney, a car that was travelling in the lane to the right of Ms. Goren's lane, and just slightly ahead of her car, gradually began to move into Ms. Goren's lane.[4] Although the other car did not completely enter Ms. Goren's lane, the driver's-side wheels and some portion of that vehicle crossed into Ms. Goren's lane. In response, Ms. Goren moved her car to the left (westerly), and the two left wheels of her car went off the roadway. Droney further testified that there was a "straight drop off" between the paved road and the median, which he estimated measured four inches. According to both witnesses, Ms. Goren's car crossed the median of the highway, making between two and four 360 degree revolutions before coming to rest in a southbound lane of the highway. Ms. Goren was killed after her car was struck by an oncoming vehicle driven by Gene Campbell.

Through the testimony of Charles Pembleton, an accident reconstruction expert, appellant sought to establish, *inter alia,* that the encroachment of the other vehicle contributed to the cause of the accident, and that the discrepancy between the roadway and the median caused Ms. Goren to lose control of her car. Appellant also called State Trooper Charles Robbins, the officer who investigated the accident, to testify to the

---

**3.** We shall limit our summary to a discussion of facts pertinent to the issues presented.

**4.** We note that these eyewitnesses did not identify Ms. Moss as the driver of the car that allegedly forced Ms. Goren off the road. The evidence as to the identity of that driver is not pertinent to the issues presented, however.

location of various items and to describe the scene of the crash.

In the defense case, Ms. Moss denied that she moved her vehicle into the lane occupied by Ms. Goren's car. She said that she heard a loud noise, and then saw Ms. Goren's car leave the paved highway, cross the median strip, and come to rest in an oncoming lane. The defense also called an accident reconstruction expert, Maryland State Trooper Sergeant Albert Leibnow, to refute the existence of a drop-off significant enough to cause the accident, and to establish that Ms. Goren was negligent.

Additional facts will be included in our discussion of the issues.

## I.

Appellant argues that the trial court erred in permitting appellees to cross-examine Trooper Robbins, called by appellant as a fact witness, as if he were an expert witness. He asserts that the appellees improperly elicited opinions as to several critical aspects of the accident. Appellees counter that a trial judge has substantial discretion to permit a lay witness to testify to opinions that are helpful to the jury and rationally based on the witness's observations. They also assert that the trial court did not abuse its discretion in this regard.

Trooper Robbins testified that he responded to the scene of the accident and investigated the crash, both on the morning of the accident and for several days afterward. He outlined the scene, including the location of the vehicles, the condition of the two cars involved in the accident, and the tire marks on the southbound lanes and in the median. The Trooper also described a construction barrel that was overturned on the northbound side of the highway, and explained that he found, near the barrel, the rear view mirror belonging to Ms. Goren's car. Robbins further said that he took photographs and measurements of the scene and interviewed various witnesses, including Droney, Harmon, Campbell, Andrea McGill, the

driver behind Campbell, and Moss. He also stated that he measured the drop-off at six or seven spots along the highway, which varied from 1/2 inch to 1 1/2 inches.

It is undisputed that Trooper Robbins was not an accident reconstruction expert.[5] Indeed, he conceded that he had no special training in that field. Moreover, no party ever sought to offer him as an expert witness, and the court thus never received Robbins as an expert.[6] Nevertheless, on cross-examination, over appellant's objection, Genstar introduced into evidence a diagram of the accident scene, drawn by Robbins before trial, that purported to show the location of various objects as well as his opinion of the travel path of Ms. Goren's car. The following colloquy is relevant.

> **Counsel for appellant:** I am objecting to his diagram because it is not what he found at the scene. It would be based on hear—it is what he heard as having happened. So it would be based on hearsay and based on a number of other things. . . .
>
> \* \* \* \* \*
>
> In addition, it is an opinion and his testimony is based on opinion and I think that goes beyond the factual questions that I asked him. I was very, very careful in asking questions about what he found at the scene and his interpretation.

---

5. In the defense case, the trial court received Trooper Leibnow as "an expert in the field of automobile accident reconstruction." Leibnow testified that, in his opinion, Ms. Goren left the roadway twice, that she never applied her brakes, that she continued to apply the accelerator throughout the incident, and that applying the accelerator was the cause of the accident.

6. At one point, appellees suggested to the trial court that they considered Robbins an expert witness. As we noted, however, appellees did not proffer Robbins as an expert and probably could not have successfully done so; he testified, both in deposition and at trial, that he had no expertise in accident reconstruction.

\* \* \* \* \*

**Counsel for Genstar:** Well ... I am not saying this [diagram] is predicated upon hearsay. There is a photograph showing a barrel that he will identify as being down here in relation to obviously where everybody knows the car ended up. There are other photographs, Your Honor, showing tread marks, track marks across the median which would indicate the direction this was going and the fact there was no 360. All of those are physical facts that he found at the time of his you know—

**The court:** How does he know whether there was a 360 or not?

**Counsel for Genstar:** Because you can tell from the tracks in the median, Your Honor.

**The court:** And what difference does it make in this case whether there was a 360 or not?

**Counsel for Genstar:** Because there are two witnesses who said there was a 360 and their credibility is being challenged right now.

\* \* \* \* \*

**The court:** I am going to overrule the objection.

\* \* \* \* \*

**Counsel for appellant:** I am going to object and just trying to save my appellate rights. I am going to except to this coming in because, number one, it goes beyond the scope of his testimony. Number two, it goes beyond—and he was just called as a fact witness, as to what he found at the scene.

Number two, number two, it calls into—it permits him to testify as an expert in interpreting what he found and what information he was given. He has testified at deposition that he is not an accident reconstructionist. He has received no training in accident reconstruction. He is not a civil engineer and he has also received no training in the drawing of diagrams.

Now, I think that on these matters that it goes beyond the scope the fact that he is not an expert, the fact that he is not an accident reconstructionist, the fact that he is basing his testimony partially on hearsay creates, I believe, reversible error to permit in this diagram and it is the last thing I want to see happen in this case.

\* \* \* \* \*

**The court:** Let me do this. The only way for me to really rule on this matter is for me to hear all this testimony on the diagram out of the presence of the jury which I am not going to do. You have a continuing objection.

Later, the court sustained appellant's objections to testimony concerning Trooper Robbins's opinion of the cause of the accident. The court stated:

Nobody ever asked him to be qualified as one. He has been called to the witness stand as a fact witness. He is going—As a result of his investigation he is going to make a big leap to a conclusion. At least it sounds like a big leap to me. . . .

\* \* \* \* \*

He is not an expert. He has not been qualified as an expert. He has testified as to his investigation.

\* \* \* \* \*

It does go to the ultimate issue in this case as to causation. I am not satisfied without him being an expert witness, never having been qualified as an expert witness or even offered as an expert witness for purposes of this discussion that he should be allowed to testify as to that ultimate issue.

Notwithstanding numerous objections from appellant, the court permitted the defense to question Robbins about his

interpretation of other important aspects of the accident.[7] The following exchanges are illustrative.

**Counsel for Genstar:** Did the marks made by that vehicle as it crossed the median into the southbound lane indicate any 360 degree revolution?

**Counsel for appellant:** Objection.

**The court:** Overruled.

**Counsel for Genstar:** I am sorry.

**Trooper Robbins:** No, sir, they did not.

\* \* \* \* \*

**Counsel for Genstar:** How many times did Mrs. Goren leave the roadway according to your investigation?

**Trooper Robbins:** That was—

**Counsel for appellant:** Objection.

**The court:** Overruled.

**Trooper Robbins:** Twice that she left the road.

**Counsel for Genstar:** Twice plus or twice including the time she crossed the median?

**Trooper Robbins:** Including that time. She never really got back up onto the roadway completely.

**Counsel for Genstar:** So she hit the [construction] barrel and came back onto the grass how many times after that?

**Trooper Robbins:** She hit the barrel and then came back on with two wheels on the grass, then came back completely into lane one northbound, and then went back into the grass with two wheels, and then in trying to correct, and then went completely off the road.

**Counsel for Genstar:** So if my math is correct there were a total of three times that she went into the grass?

**Counsel for appellant:** Objection.

**The court:** Let the witness tell us.

---

**7.** Appellees have not asserted that appellant's objections were insufficient to preserve appellant's claims of error.

**Counsel for Genstar:** It is cross-examination, Your Honor.

**The court:** Let the witness tell us.

**Counsel for Genstar:** Yes, sir.

**Trooper Robbins:** I think it would have been basically three but she never really got all of her wheels out for the third time.

* * * * *

**Counsel for SHA:** Now, when the vehicle came back onto the road did there come a point where it went off the road again?

**Trooper Robbins:** Yes, it did.

**Counsel for appellant:** Same objection.

**The court:** Overruled.

**Counsel for SHA:** How many wheels went back onto the median at that point?

**Trooper Robbins:** Two wheels, sir.

**Counsel for SHA:** Okay, and did four wheels ever go onto the median at that point when the vehicle started going on a second time?

**Trooper Robbins:** Not immediately but they did not long after that.

**Counsel for SHA:** Now, at that point when the vehicle went off a second time did it ever come back onto the road?

**Trooper Robbins:** Not completely, no, sir. The two left wheels stayed in the median.

* * * * *

**Counsel for SHA:** In the course of your accident investigation are you trained to determine whether a car has applied its brakes in a situation like this?

**Trooper Robbins:** Yes, sir.

**Counsel for SHA:** And how do you make that determination?

**Trooper Robbins:** The marks left by the wheels are different depending on what the speed of the vehicle—whether it

was braking, whether it was moving to one side or whether it was moving at a constant speed.

**Counsel for SHA:** Okay, and the brake marks, the marks that are made from braking are different on pavement that on grass, correct?

**Trooper Robbins:** Yes.

**Counsel for SHA:** Now, did you make a determination as to whether or not Mrs. Goren applied her brakes between the time she first went off the road and the time she finally went off road and crossed the median?

**Counsel for appellant:** Objection.

**The court:** Overruled.

**Trooper Robbins:** Yes, sir, I did.

**Counsel for SHA:** And what was your determination?

**Trooper Robbins:** That she hadn't. She hadn't braked at any time.

 "The rule in Maryland is that a lay witness is not qualified to express an opinion about matters which are either within the scope of common knowledge and experience of the jury or which are peculiarly within the specialized knowledge of experts." *King v. State,* 36 Md.App. 124, 373 A.2d 292, *cert. denied* 281 Md. 740 (1977). A lay witness may opine "on matters as to which he or she has first-hand knowledge." *Waddell v. State,* 85 Md.App. 54, 66, 582 A.2d 260 (1990). *See also Tedesco v. Tedesco,* 111 Md.App. 648, 666, 683 A.2d 1133 (1996); L. McClain, MARYLAND EVIDENCE § 602.1 (1987). Only lay opinions that are "rationally based on the perceptions of the witness and helpful to the trier of fact" are admissible, however. *Wyatt v. Johnson,* 103 Md.App. 250, 268, 653 A.2d 496 (1995); McLain, *supra,* § 701.1, at 192. The admissibility of a lay opinion is vested in the sound discretion of the trial court. *Tedesco,* 111 Md.App. at 666, 683 A.2d 1133; *Wyatt,* 103 Md.App. at 268, 653 A.2d 496; *Waddell,* 85 Md.App. at 66, 582 A.2d 260; *Yeagy v. State,* 63 Md.App. 1, 22, 491 A.2d 1199 (1985).

The general principle governing lay opinions is embodied in Maryland Rule 5–701, which states:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

The two requirements in Rule 5–701 for the admissibility of lay opinions are conjunctive. Thus, a lay opinion must be based on the perceptions of the witness *and* must be helpful to the trier of fact.

A classic example of the type of lay opinion that is properly admissible is found in *Brown v. Rogers*, 19 Md.App. 562, 313 A.2d 547 (1974), in which a mother testified that after her child was struck by a car, the child was in great pain during her hospital stay. We said:

> Such testimony has generally been admitted where all the transient physical conditions which the witness observed— tone of voice, expression of the face, the movement of the limbs-which indicated the injured person was in pain could not be reproduced for the jury in such precision and fullness as to impress the jury in the same manner as the observer was impressed and as to permit the jury to draw its own inference.

*Id.* at 568–69, 313 A.2d 547. *See also Beahm v. Shortall*, 279 Md. 321, 336, 368 A.2d 1005 (1977) (finding that a lay witness could testify as to the speed of an object); *Mulligan v. Pruitt*, 244 Md. 338, 223 A.2d 574 (1966) (finding that a lay witness could testify to the length of skid marks).

We recognize that "[t]he distinction between fact and opinion is often difficult to draw." Joseph F. Murphy, Jr., MARY-LAND EVIDENCE HANDBOOK § 603(B), at 330 (1993). Appellees seem to concede that the Trooper offered opinion testimony in various respects. They argue, however, that the testimony was properly admitted as lay opinion, because it was based on the Trooper's perceptions of the evidence and was helpful to

the jury, to explain the path of Ms. Goren's car after she lost control of the vehicle, and other matters.

We are of the view that Robbins's opinions were not properly admitted as lay opinion testimony. "[W]hen ... the witness is 'pulling together' his observations and is therefore testifying to conclusions, the trial judge should not admit such testimony." Murphy, *supra,* § 603(B), at 328. *See, e.g., In re Nawrocki,* 15 Md.App. 252, 289 A.2d 846 (1972) (finding that officer's testimony that juvenile used "profane" language was conclusory; it was for the trier of fact to determine if the language was "profane"). Much of the Trooper's testimony included his conclusions based on his investigation of the occurrence. For example, he testified about the following: Ms. Goren never applied her brakes during the occurrence; her vehicle left the roadway twice; she struck the construction barrel; after she hit the barrel, she had two wheels on the grass and then returned to the northbound lane before again going completely off the road; her car did not make any 360 degree revolutions. This testimony certainly exceeded a recitation of facts that Robbins observed at the scene.

Moreover, Robbins's testimony did not satisfy the requirements of Rule 5–701. First, it is clear that the Trooper's opinions were not based upon events that he witnessed; he acknowledged that he was not present at the time of the accident. Second, Robbins's opinions were not helpful to the jury, within the meaning of the rule, because they were the type of opinions that required an expertise in accident reconstruction, which Robbins admittedly did not possess. *See* McLain, *supra,* at 195–96 ("[I]mpermissible opinions can be broken down further into two sub-categories.... The second sub-category is comprised of matters as to which a person would have to be an expert *in order to be able to reach a rational conclusion.*" (Emphasis added)). *See also Bruce v. State,* 328 Md. 594, 630, 616 A.2d 392 (1992) (stating that, historically, non-expert opinions have been excluded from evidence in areas in which only an expert could reach a rational conclusion), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993).

Our decision in *Mitchell v. Montgomery County*, 88 Md. App. 542, 596 A.2d 93 (1991) is instructive. There, the County called as a "fact witness" an employee of the Maryland Department of Transportation, who was not present at the time of the accident, to "describe the road" on which the plaintiff had been struck by a County-owned bus. Although the witness was never offered or received as an expert witness, "it quickly became apparent that he was testifying, in significant part, to matters which constituted expert opinion." *Id.* at 550, 596 A.2d 93. The County, for example, elicited opinions from the employee that the road was a "major arterial highway," "a limited access highway," and that the right hand lane of the road was an "acceleration, deceleration lane for ingress." We reasoned that the testimony concerned "technical terms about which the average layman cannot testify based on his or her own perceptions and experiences." *Id.* at 552, 596 A.2d 93. Because the testimony "was central to both [appellant's] theory of primary negligence *and* the County's affirmative defense that Mitchell was contributorily negligent," *id.* at 553, 596 A.2d 93, appellant was prejudiced.[8]

Similarly, the opinions offered by Robbins concerned areas about which the average lay person, without the benefit of training in accident reconstruction techniques, could not testify. Robbins provided a "cloak of 'expertise' without the trouble or the formalities of qualification [as an expert]." *Mitchell*, 88 Md.App. at 552 n. 6, 596 A.2d 93.

 Even if the court erred, appellees vigorously assert that appellant was not prejudiced, because the Trooper's testimony concerned only the question of Ms. Goren's contrib-

---

8. The Court acknowledged that, under certain circumstances, the trial court did not necessarily have to exclude such expert testimony. The Court was troubled, however, by the fact that the witness had never been identified as an expert in answers to interrogatories. Further, once the trial court recognized that the witness had offered expert opinion, the judge should have required the County to establish his expert qualifications. Moreover, we suggested that the trial judge should have provided appellant with an opportunity to examine the witness's credentials. But, "doing nothing was not the answer...." 88 Md.App. at 553, n. 7, 596 A.2d 93.

utory negligence, and not the alleged negligence of appellees. They reason that since the jury found them not liable, irrespective of Ms. Goren's contributory negligence, reversal is not appropriate on this issue. We disagree.

In our view, Trooper Robbins's testimony cannot be so neatly cabined. At trial, appellees stated that their questions of Trooper Robbins were directed at attacking the credibility of Droney and Harmon, two of appellant's witnesses. Unlike Robbins, however, Droney and Harmon were eyewitnesses to portions of the occurrence. Further, while the jury could have used much of the Trooper's testimony to decide the issue of contributory negligence, we cannot say that it did not rely on some of the objectionable testimony to resolve the issues of appellees' primary negligence.

For example, appellant postulated that the drop-off from the roadway to the median caused Ms. Goren to lose control of her car and spin into oncoming traffic. Robbins's testimony that Ms. Goren's car left the roadway twice, and did not make 360 degree revolutions in the median strip, arguably bears on the *grading of the shoulder*, an important factor in deciding Genstar and SHA's liability. If the jury believed that Ms. Goren was able to return to the roadway at least once, and that her car did not make revolutions in the median, they may have concluded that the drop off was not a significant factor in causing the accident. Further, with respect to the issue of proximate cause, independent of any consideration of Ms. Goren's contributory negligence, the jury may have relied on the Trooper's opinions about the path of Ms. Goren's car, the distance the car travelled, and whether the car left the road way twice.

Moreover, although appellee's accident reconstruction expert, Leibnow, testified to some of the same conclusions that Trooper Robbins offered, Robbins's testimony was clearly more damaging to appellant. After all, Robbins was appellant's witness. While the jury may have viewed Leibnow as a "hired gun," damaging information from a witness called by

the plaintiff provided an unfair and powerful advantage to appellees.

In sum, the court erred in permitting Robbins to offer his opinions that Ms. Goren struck the construction barrel, whether and how often Ms. Goren's car left the road, the path that her car travelled, whether Ms. Goren applied her brakes, and whether her car performed 360 degree revolutions. Further, to the extent that the Trooper's diagram depicted Robbins's opinion of the travel path of the vehicle, it, too, was improperly admitted. Our view is premised on the fact that the Trooper lacked the expertise to evaluate the underlying facts that formed the basis of his testimony. The error warrants a new trial.

## II.

▉ For the benefit of the court on remand, we shall address appellant's claim that the court erred in permitting the defense to collaborate in the exercise of their peremptory challenges.[9] Md. Rule 8–131(a). In particular, we shall consider whether co-parties, to whom the trial court properly awarded additional peremptory challenges, are entitled to confer and cooperate in using those strikes. We conclude that co-parties are not permitted to do so.

As a result of its finding of adverse interests between the co-defendants, the court awarded each defendant five peremptory challenges. After the removal of certain veniremen for cause, however, there was an insufficient number of potential jurors remaining in the pool when compared to the total number of combined strikes available to the parties. Accordingly, all counsel agreed, with the trial court's approval, that each party would exercise three peremptory strikes. Prior to the actual selection of the jury, appellant asked the court to instruct the defendants not to collaborate in the exercise of

---

9. Prior to trial, the court asked whether appellant had any "law to support" his position. The court commented that, "I have this request [to bar collaboration] all the time, but nobody's ever cited any authority."

their challenges. The court declined to do so. Collectively, appellees thus held a total of twelve strikes compared to the plaintiff's three. The following colloquy is relevant:

> **Counsel for appellant:** This was the last thing I was going to do before we picked a jury. I just wanted to make sure it's four sets of Defendants' strikes, that the Defendants do not confer with regard to any strikes that they use.
>
> **The court:** I keep hearing this. Are they opposed?
>
> **Counsel for Genstar:** Yes.
>
> **The court:** Have you got some rationales or law to support . . .
>
> **Counsel for appellant:** Yeah.
>
> **The court:** I have this request all the time, but nobody has ever cited any authority.
>
> **Counsel for appellant:** What I'm citing is this. The four Defendants have all requested, and you have acceded to their request, that they have their own separate strikes, but I think that is a matter of discretion with the Court.
>
> **The court:** I also think that their interests are adverse.
>
> **Counsel for appellant:** If their interests are adverse they are not exercising their interests adversely if they confer in the striking of jurors. This way they all have the same interests and that is to load up against the Plaintiff who has three strikes.
>
> Now, I realize that my strikes would be only a fifth of the total amount of strikes. I don't think it is fair for the Defendants to each—or not to each but to get together as a group if they are supposedly adverse to each other and obviously they are adverse to each other because there are suits and there are cross-claims, third party claims and each have different interests, but their interest may be the same as far as picking jurors are concerned and—
>
> **The court:** It may not.
>
> **Counsel for appellant:** Well, if they are not, then what is the difference whether or not they are—if they don't confer—and I have asked this many times and it is usually

granted. I don't think it is fair to the Plaintiff or if it was the Defendant, the other way around, I don't think it is fair to the Plaintiff to have four times as many strikes as the Plaintiff and have the ability of the Defendants to exercise all of those strikes . . .

**The court:** You assume things that I don't.

**Counsel for appellant:** As a group.

**The court:** I don't assume that because they confer that means they're going to gang up on the Plaintiff in executing their strikes. I will never know and neither will you.

**Counsel for appellant:** Yes, I will. I follow how they strike.

**The court:** Okay. Well, I'll tell you what. Anyone else wish to be heard on this issue?

**Counsel for Genstar:** No, Your Honor.

**The court:** Thank you. Plaintiff's request is denied. Counsel, go back. Exercise your peremptory challenges on behalf of your party. If you see some pattern that you can make a record with . . . I will allow you to make your record on future proceedings.[10]

---

**10.** After this exchange, the original transcript of the videotaped proceedings simply ends, with just one other line for that day: "(Counsel proceeded to select a jury at this time.)" That transcript resumes the following day with the testimony of appellant's first witness. Obviously, further proceedings, such as the actual seating of the jury, took place. But we have not been advised by the parties as to the particulars of the proceedings after jury selection, which either were not recorded or not transcribed.

Inexplicably, the copy of the transcript included in the record extract does not correspond entirely with the original transcript. For example, the version in the record extract concludes as follows: "(Counsel exercised the right of peremptory challenge and a jury was duly empaneled.) (Whereupon, the voir dire proceedings were concluded at 16:55:49.)" With respect to the preceding colloquy, there are many minor discrepancies in the two versions. When there is a discrepancy between the original transcript and the record extract version, we rely on the original transcript.

Appellees used twelve challenges to strike eleven prospective jurors.[11]

## A. Preservation of the Issue for Appellate Review

Appellees contend that appellant failed to preserve for review the issue concerning appellees' joint use of peremptory challenges. They assert that appellant failed to object to the trial court's finding that appellees had adverse interests, or to the empaneling of the jury. Further, appellees argue that the record before us is devoid of any facts from which to conclude that the defense actually collaborated in the use of their strikes.

In support of their contentions, appellees rely on *Kennedy v. Mobay*, 84 Md.App. 397, 579 A.2d 1191 (1990), *aff'd*, 325 Md. 385, 601 A.2d 123 (1992). There, in a pre-trial proceeding, the trial court granted four additional peremptory strikes to one defendant, after finding it had interests adverse to the other two defendants. Although the plaintiffs "complained about the court's willingness to let the defendants cooperate in the exercise of those eight challenges," we observed that they did not object to the granting of the additional challenges. At trial, the court confirmed that defendants would have a total of eight strikes, and at that point the appellant did not object. Moreover, after the jury was chosen, the court specifically inquired whether the panel was acceptable, and appellant specifically responded in the affirmative. *Id.* at 428–29, 579 A.2d 1191. Thus, we held that the plaintiffs had waived the argument "that the court committed reversible error in allowing the four extra challenges." *Id.* at 429, 579 A.2d 1191.

In our view, *Kennedy* is not squarely on point. It is true that appellant does not quarrel with the trial court's determi-

---

11. Although the record extract does not contain any information concerning the parties' precise use of their strikes, the court file contains both the jury selection sheet used by the court and the actual sheets submitted by the parties to the clerk, containing the parties' strikes. These documents reflect that appellees Moss and United both struck juror number 276, and appellant and SHA both struck juror number 68. Thus, the parties collectively challenged a total of thirteen veniremen.

nation, pursuant to Md. Rule 2–512(h), that the appellees had adverse or hostile interests and were thus entitled to additional peremptory challenges. Rather, appellant focuses on the appellees' use of those strikes. In contrast to *Kennedy*, however, the record before us does not reflect that appellant affirmatively represented that the jury panel was acceptable. Moreover, we are unpersuaded that, in order to preserve the claim of error as to the manner in which the co-parties exercised their challenges, appellant had to quarrel with the court's underlying decision to award additional jury strikes.

Appellees' other assertions as to preservation are problematic. Appellant specifically sought a ruling from the court directing appellees not to confer in using their strikes, and the court explicitly rejected the request. Certainly, it was appropriate for counsel to raise the matter *prior* to jury selection, for that is when the court best had the ability to act upon the request. Nevertheless, appellant's counsel, an experienced trial attorney, thereafter did not describe for the record exactly what occurred during jury selection, although the trial judge invited counsel to document a "pattern" for "future proceedings," and appellant's counsel suggested that he would know whether appellees "ganged up," because he would "follow" the manner in which they used their strikes.

The type of off-the record conduct in which parties engage during the exercise of peremptory challenges in a civil case would not be reflected in the transcript of the proceedings. Thus, in order for an appellate court to review the propriety of the alleged actions, there must appear on the record a statement or description of the challenged conduct. Otherwise, we are left to speculate as to whether the parties actually collaborated.[12] What we said in *Braxton v. Faber*, 91 Md.App. 391,

---

12. We recognize that it might be difficult for a sole practitioner, who is involved in exercising his own jury challenges, to focus simultaneously on whether or how his adversaries are collaborating. Moreover, opposing co-parties may, understandably, try to conceal the manner of their cooperation, as a matter of strategy. At the very least, though, appellant's counsel could have explained to the court why, if at all, he was

408–09, 604 A.2d 543 (1992) (footnotes omitted), albeit in another context, is pertinent here:

> [I]n order to obtain review of the conduct and actions of a trial judge during the course of a proceeding in which it is alleged that such conduct is detrimental to a party's case and where the party raises the issue during the trial, review of that conduct, as a practical matter, requires a record in which (1) facts are set forth in reasonable detail sufficient to show that purported bias of the trial judge....

Further, a requirement that appellant renew his objection after the collaboration would conform to the accepted rule that obtaining an advance ruling from the trial court does not preserve an issue for appeal; an objection after the offending act has actually occurred is usually required. For example, when a party seeks a trial court's ruling on a motion in limine, the party must nevertheless object to the admission of the evidence during trial, in order to preserve the objection. *U.S. Gypsum Co. v. Mayor and City Council of Baltimore*, 336 Md. 145, 647 A.2d 405 (1994). A similar rule prevails concerning jury instructions. Maryland Rule 2–520(e) provides that, "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record *promptly after the court instructs the jury ....*" In *Black v. Leatherwood Motor Coach Corp.*, 92 Md.App. 27, 606 A.2d 295, *cert. denied sub nom., Leatherwood Motor Coach v. Martinez*, 327 Md. 626, 612 A.2d 257 (1992), we held that the appellants did not preserve their objection to an appellee's requested instruction, because they failed to renew their objection after the instructions.

In view of the posture of the case, however, we need not resolve the preservation issue. Suffice it to say that, given Genstar's opposition to any prohibition of collaboration, coupled with the trial court's express determination to permit collaboration, it is unlikely that mere serendipity culminated in

---

unable to document whether the parties collaborated. He also could have invited the court to ask counsel whether they collaborated.

the striking of eleven potential jurors by four lawyers who had a combined maximum of twelve challenges.

### B. Rule 2–512(h)

Peremptory challenges are a venerated and invaluable tool in what some consider the art of jury selection. The Supreme Court has long noted the value of peremptory challenges in effectuating a party's right to an impartial jury. *See Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). In Maryland, the importance of such strikes has consistently been reaffirmed by practice, statute, and rule. *See Spencer v. State,* 20 Md.App. 201, 314 A.2d 727 (1974); *see also Eagle–Picher Indus. v. Balbos,* 326 Md. 179, 188–194, 604 A.2d 445 (1992) (discussing the present rule governing peremptory challenges and its predecessor rule).

Maryland Rule 2–512(h) governs peremptory challenges in civil cases. It states:

> Each party is permitted four peremptory challenges plus one peremptory challenge for each group of three or less alternate jurors to be impanelled. For purposes of this section, several plaintiffs or several defendants shall be considered as a single party unless the court determines that adverse or hostile interests between plaintiffs or between defendants justify allowing to each of them *separate* peremptory challenges not exceeding the number available to a single party. *The parties shall simultaneously exercise their peremptory challenges by striking from the list.*

(Emphasis added).

Ordinarily, under Rule 2–512(h), when there is "more than one plaintiff or more than one defendant, each side is considered as a single party for the purpose of exercising peremptory challenges *unless the parties on one side are adverse to each other or have hostile interests."* Paul V. Niemeyer and Linda M. Schuett, MARYLAND RULES COMMENTARY 377 (2d ed.1992) (emphasis added). The rule recognizes that there are cases in which one side of a suit is not united in its pursuit of a

single claim or a single mode of defense. Co-parties, while sharing a common adversary, may also have differences between themselves significant enough so that a single set of challenges does not adequately address their individual interests in shaping the jury.

Under the rule, the trial court must engage in a two step process before granting co-parties additional peremptory challenges. The court must first conclude that the co-parties have adverse or hostile interests, although the court "need not expressly have articulated that finding." *Eagle–Picher*, 326 Md. at 190, 604 A.2d 445. If it so finds, the court must determine, in its discretion, whether the adverse interests justify granting additional peremptory challenges. *Kloetzli v. Kalmbacher*, 65 Md.App. 595, 599, 501 A.2d 499 (1985). Even if the court determines that there are hostile co-parties, it is not required to award additional strikes. *Eagle–Picher*, 326 Md. at 191–92, 604 A.2d 445.

Upon an award of additional peremptory challenges, appellees assert that the rule does not expressly prohibit collaboration among co-parties. They urge that an abuse of discretion standard applies to the trial court's decision permitting collaboration. In contrast, appellant argues that authorizing co-parties to use their additional peremptory challenges in concert thwarts the purpose of the rule.

In our view, Rule 2–512(h) requires adverse co-parties who have been granted additional peremptory challenges to exercise the strikes independently, without collaboration. We derive our conclusion, first, from the plain meaning of the rule. The rule expressly states that the trial court may allow each co-party "*separate* peremptory challenges." (Emphasis added). Moreover, Rule 2–512(h) requires the "parties" to exercise their challenges "simultaneously." [13] Using simultaneous

---

13. F.R.Civ.P. 47 is the federal counterpart to Maryland Rule 2–512. It provides that the trial court shall award peremptory challenges as provided in 28 U.S.C. 1870 (1996). In contrast to the Maryland rule, that statute specifically states that the trial court may permit co-parties

challenges necessarily prevents a party from taking into consideration the challenges exercised by an opponent or coparty.[14]

The Maryland Rules are "precise rubrics and not mere guidelines" and "are to be read and followed." *Jones v. State,* 61 Md.App. 94, 102, 484 A.2d 1050 (1984). When interpreting the rules, courts employ the same canons of interpretation as those used in the interpretation of statutes. *In re Victor B.,* 336 Md. 85, 646 A.2d 1012 (1994); *Lennon v. Strazzella,* 331 Md. 270, 627 A.2d 1055 (1993); *Pappas v. Pappas,* 287 Md. 455, 413 A.2d 549 (1980). The court first looks to the words of the rule and accords them their ordinary and natural meaning. *In re Victor B.,* 336 Md. at 94, 646 A.2d 1012. Only if the language of the rule is ambiguous must the court look to other sources to determine the intent of the rule. *Id.*; *Lennon,* 331 Md. at 274, 627 A.2d 1055. The court may compare the result obtained from a plain meaning interpretation of the rule with the purpose of the rule as an aid in interpretation. *Lennon,* 331 Md. at 276–77, 627 A.2d 1055. The plain meaning of the words in Rule 2–512(h) compels the conclusion that we reach here.

We also find support for our view in *Eagle–Picher,* an asbestos case. There, the Court of Appeals considered whether " 'adverse co-parties are entitled to participate in the exercise of the same number of peremptories as the co-parties would otherwise collectively share in the absence of adversity.' " *Eagle–Picher,* 326 Md. at 190, 604 A.2d 445 (quoting brief of appellant ACandS, Inc.). After finding that the manufacturer defendants and supplier/installer defendants had

---

to exercise their additional peremptory challenges "separately or jointly."

**14.** Unlike in civil cases, counsel for co-defendants in a criminal case have a Sixth Amendment right under the Constitution to confer in the exercise of peremptory strikes. *Clark v. State,* 306 Md. 483, 510 A.2d 243 (1986). Maryland Rule 4–313, which governs peremptory challenges in criminal cases, provides that *each* defendant is entitled to the prescribed number of challenges, even when defendants are jointly tried. *See Sharp v. State,* 78 Md.App. 320, 552 A.2d 1367 (1989).

adverse interests, the trial court determined to award the hostile co-parties separate peremptory challenges equal to the number available to a single party.

Because of the number of alternates to be chosen, the court initially planned to allow the plaintiffs six challenges, and to allow the co-defendants a total of twelve strikes. After removing potential jurors for cause, however, the parties held more challenges than there were persons remaining in the venire. To avoid the need to repeat the voir dire the following day, the court sought to resolve the issue by reducing the number of challenges available to the parties. The plaintiffs agreed to reduce their challenges to four, with a corresponding reduction to eight challenges for the defendants. The co-defendants objected to this procedure, claiming that they were each entitled to exercise six challenges under Rule 2–512(h).

The Court of Appeals upheld the trial court's actions. It said that,

upon finding hostility with a coparty, the trial court, in its discretion, could divide among the separate interests the strikes to which, absent hostility, all plaintiffs or all defendants were entitled, *to be exercised separately,* or the court could grant additional strikes and allocate the peremptories, so increased, among the separate interests, *to be exercised separately* by each interest.

*Eagle–Picher,* 326 Md. at 191, 604 A.2d 445 (emphasis added) (citing *Eagle–Picher v. Balbos,* 84 Md.App. 10, 578 A.2d 228 (1990)). *See also St. Luke Evangelical Lutheran Church, Inc. v. Smith,* 318 Md. 337, 342–43, 568 A.2d 35 (1990); Niemeyer & Schuett, *supra,* at 377 ("[T]wo plaintiffs with a uniformity of interest are entitled to four peremptory challenges between them. On the other hand, two defendants who have filed cross-claims against each other have interests adverse to each other and are usually entitled to four each.").

There are, at least potentially, significant differences created by either permitting or prohibiting collaboration among co-parties. In deciding how to use its peremptory challenges, a party usually prioritizes the potential jurors it wants to elimi-

nate, according to the party's sense about whether a potential juror will be receptive or unreceptive to the party's theory of the case. Obviously, the more challenges a party has, the more likely it is that the party will be able to influence the makeup of the jury, and to select a jury that the party hopes will be favorable to its position. What Judge Moylan said in *Spencer* is apt here:

> Although the peremptory challenge, to be sure, only entitles a defendant to reject jurors and not to select others, there is at least some element of indirect selection inexorably at work in the very process of elimination. The right to reject need not be exercised in the dark, but is . . . a right of informed and comparative rejection.

*Spencer*, 20 Md.App. at 208, 314 A.2d 727.

If co-parties cannot confer, each has to prioritize its own strikes and to ponder independently those jurors that the other parties are likely to eliminate. Without an opportunity to consult, multiple co-defendants may have to move to strike the same particular juror, rather than run the risk that a particular potential juror, undesired by the party for one reason or another, will not be eliminated by someone else. Allowing co-parties to collaborate, however, removes that risk, because through collaboration, they may first allot challenges against those jurors whom all co-defendants considered most adverse, and then use the remaining challenges to strike deeper into the pool of prospective jurors, while avoiding duplication or wasting of strikes. By collaboration, they avoid multiple strikes lodged against the same juror or jurors.[15] Concomitantly, the co-parties' collaboration dilutes the effectiveness of the opposing party's challenges and significantly impairs that party's full exercise of peremptory challenges. *See King v. State Roads Comm'n*, 284 Md. 368, 371, 396 A.2d 267 (1979).

---

**15.** Of course, if co-parties' interests are adverse, it is possible that they would not necessarily seek to strike the same prospective jurors.

Certainly, the purpose of allowing co-parties to obtain additional peremptory challenges is not to enhance the ability of one side to influence the makeup of the jury at the expense of the other side. *See St. Luke,* 318 Md. at 343, 568 A.2d 35 (finding no abuse of discretion where the trial court allotted additional strikes to a single plaintiff, while maintaining the original proportion of strikes between the parties). Restricting collaboration among co-parties will permit them to use their individual strikes to protect their varied interests, without artificially inflating the number of strikes on one side, to the substantial disadvantage of the opposing side. Moreover, prohibiting consultation is consistent with the purpose of the rule, which is to permit additional strikes to protect co-parties whose interests are adverse.

**JUDGMENTS REVERSED. CASE REMANDED FOR NEW TRIAL.**

**CROSS–APPEALS OF MARYLAND STATE HIGHWAY ADMINISTRATION AND UNITED STATES FIRE INSURANCE COMPANY DISMISSED.**

**APPELLEES TO PAY COSTS.**