CHARLES SPENCER, ALIAS ALFRED MOHORN
*v.* STATE OF MARYLAND

[No. 378, September Term, 1973.]

*Decided February 14, 1974.*

The cause was argued before ORTH, C. J., and MOYLAN and LOWE, JJ.

*Richard S. Kahn* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Joseph Lyons, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

As early as 1481 when Sir Thomas Littleton published his *Tenures,* the availability to a criminal defendant of the

unfettered right to challenge peremptorily prospective jurors was already of long and settled usage. Sir James Fitzjames Stephen in 1 *A History of the Criminal Law of England*, 301-303, (1883) finds references to the procedure as early as the writings of Bracton (c. 1252) and Britton (c. 1290). The first statute on the subject, The Ordinance for Inquests, 33 Edw. 1, Stat. 4 (1305), cut back on the unlimited use of peremptory challenges by the Crown, but left untouched at 35 the number of peremptories available to a criminal defendant. That number was reduced to 20 by 25 Hen. 8, c. 3 (1533). The procedure was thus already of ancient vintage, with a pedigree of over 500 years, when Sir William Blackstone wrote in 4 *Commentaries on the Laws of England*, 353-354:

> "[I]n criminal cases, or at least in capital ones, there is, *in favorem vitae*, allowed to the prisoner an arbitrary and capricious species of challenge to a certain number of jurors, without showing any cause at all; which is called a *peremptory* challenge: a provision full of that tenderness and humanity to prisoners, for which our English laws are justly famous. This is grounded on two reasons. 1. As every one must be sensible what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another; and how necessary it is, that a prisoner (when put to defend his life) should have a good opinion of his jury, the want of which might totally disconcert him; the law wills not that he should be tried by any one man against whom he has conceived a prejudice, even without being able to assign a reason for such his dislike. 2. Because, upon challenges for cause shown, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment; to prevent all ill consequences from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside.
>
>     .   .   .   .

> The peremptory challenges of the prisoner must, however, have some reasonable boundary; otherwise he might never be tried. This reasonable boundary is settled by the common law to be the number thirty-five; that is, one under the number of three full juries. For the law judges that five and thirty are fully sufficient to allow the most timorous man to challenge through mere caprice; and that he who peremptorily challenges a greater number, or three full juries, has no intention to be tried at all."

The accepted use of the peremptory challenge, as an incident to the right of trial by jury, came to the Maryland Colony with the first settlement. Its history in this State, and statutory vicissitudes, is well traced in *Turpin v. State*, 55 Md. 462. See also *Parker v. State*, 227 Md. 468, 470-471, 177 A. 2d 426, and *Brice v. State*, 264 Md. 352, 365-367, 286 A. 2d 132. Judge Gilbert discussed and analyzed in great depth the nature of the peremptory challenge in *Pearson v. State*, 15 Md. App. 462, 291 A. 2d 167. See also *Bever v. State*, 4 Md. App. 436, 439-440, 243 A. 2d 634, and *Johnson v. State*, 9 Md. App. 143, 148-151, 262 A. 2d 792.

The Supreme Court recognized the value of the right in *Lewis v. United States*, 146 U. S. 370, 13 S. Ct. 136, 36 L. Ed. 1011 (1892). See also 47 Am. Jur. 2d, *Jury*, §§ 233-264; 50 C.J.S., *Juries*, §§ 279-285. In *Swain v. Alabama*, 380 U. S. 202, 85 S. Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court discussed the nature of the challenge at 380 U. S. 220-221:

> "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. . . . While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. . . . It is often exercised upon the 'sudden impressions and

unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another,' . . . upon a juror's 'habits and associations,' . . . or upon the feeling that 'the bare question [a juror's] indifference may sometimes provoke a resentment,' . . . It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be." (Citations omitted.)

The full exploitation of this right to the unfettered employment of one's peremptory challenges was allegedly denied the appellant, Charles Spencer, also known as Alfred Mohorn, in his trial before Judge Charles D. Harris and a jury in the Criminal Court of Baltimore. The appellant stood charged with two violations of Art. 27, § 286 (a) (1), possession of a controlled dangerous substance in sufficient quantity to indicate an intent to distribute, one of which was a felony carrying a maximum sentence of 20 years. The appellant elected to be tried by a jury. As such, he was entitled, under the major charge, to the benefit of Maryland Rule 746 a 1, which provides:

"In a trial in which the defendant is subject, on any single count, to a sentence of death, life imprisonment or twenty years or more of imprisonment, except for common law offenses for which no specific penalty is provided by statute, each defendant shall be permitted twenty peremptory challenges and the State shall be permitted ten peremptory challenges for each defendant."

A typical jury panel in Baltimore City is assigned to one of the many civil or criminal courts operating in the Baltimore Courthouse. It consists of 25 persons. The names of those 25 persons are printed on a long, rectangular strip of paper.

Following the full name of each person is a listing of the occupation, the home address, the place of employment, the sex, the age, the degree of formal education of that person, as well as the name, occupation and place of employment of the spouse. When some, or all, of the jurors assigned to a particular panel are not pressed into service in the home courtroom, they are sent to the jury assembly room, where they remain available for duty anywhere in the Courthouse or its Annex.

In the case at bar, 50 potential jurors were brought together from three not-yet-exhausted panels. From Criminal Court Part III, Judge Harris's home court, 16 jurors were still available from the original panel of 25 (Judge Harris's panel). From Criminal Court Part I (Judge Levin's panel), came 21 potential jurors. From Criminal Court Part IV (Judge Watts's panel), came an additional 13 potential jurors. On each of the three printed lists, the available jurors were indicated by a red check mark to the left of the name. Such lists, so checked, were made available to the State and to the defense. The court clerk worked from his own copies of the same lists.

The voir dire examination resulted in none of the 50 prospective jurors being disqualified for cause. The selection process, where the peremptory challenges would be used, began with Judge Levin's panel. An analysis of that process reveals an apparently adroit and tactically complex battle between the State and the defense. In the course of the selection battle, the State used all of its 10 peremptory challenges and the defense ultimately exhausted all of his 20 peremptories. Each side used an additional peremptory before two alternates were finally selected.

By the time the 21 available jurors on Judge Levin's panel had been called up, in regular order reading from the top of the list to the bottom, the State had used three of its 10 peremptory challenges; the defense had used 10 of its 20 peremptory challenges; and the first eight chairs of the jury box were tentatively filled.

The selection process then turned to Judge Harris's panel. By the time the first eight names on that list had been

called, again being called in regular order from the top of the printed strip to the bottom, the defense had used an additional four peremptories, for a total of 14, and all 12 chairs in the jury box were tentatively occupied. The strategic battle then began in earnest. The State unseated tentative juror no. 3, using its fourth peremptory in the process. The defense then used an additional peremptory, its 15th, before seat 3 was ultimately filled. The State then unseated prospective juror no. 7, using its fifth peremptory in the process. Both the defense and the State used an additional peremptory, the defense its 16th and the State its sixth, before seat 7 was ultimately filled. The State then unseated prospective juror no. 1, using its seventh peremptory in the process. That seat was immediately filled by the next person called. The State then unseated prospective juror no. 12, using its eighth peremptory in the process. That vacant seat was immediately filled by the next person called.

The defense then unseated prospective juror no. 5 by using its 17th peremptory challenge. The State exhausted its ninth peremptory before seat no. 5 was again tentatively filled. After having preliminarily accepted that person to fill seat no. 5, the State, as was its prerogative, looked over the entire group of 12 before giving its ultimate approval to the jury as a whole. Rethinking its strategy, it then unseated tentative juror no. 5 with the use of its tenth and final peremptory challenge. That last maneuver also exhausted the 16 names on Judge Harris's panel. The selection process then turned to the 13 names on Judge Watts's panel.

The tactical prospect then facing the appellant was this: He had three peremptory challenges remaining and the State had none. Seat no. 5 in the jury was vacant. The last list of 13 available names was sitting before him. He knew (or thought he knew) the order in which those 13 persons would be called. By exercising or not exercising some or all of his remaining peremptories, the appellant was in a position to select (by not rejecting) any of the next four names on the list to fill seat no. 5. He chose to go for the fourth name on the list. Accordingly, when the first three

names on the list were called (and they were called in predictable order), the appellant exhausted his 18th, 19th and 20th peremptory challenges.

With both the State and the appellant being out of peremptories, everyone awaited the calling by the clerk of the next name on the list to fill the remaining empty seat in the jury box. With no explanation or warning, the clerk suddenly departed from the standard operating procedure and jumped over the next three names on the list, calling the name of the fourth person down the line to fill seat no. 5. The appellant, through counsel, immediately lodged the following protest:

"If Your Honor please, we have reached a point in the choosing of a jury where both the State and the defense have exhausted their strikes. Now, throughout the course of the announcing of the names with respect to jurors, they have been going down the list from top to bottom and recording those checked as being present, with one exception where a young lady was not checked, that was inadvertent. The defense having seen that the State was out of challenges, also taking cognizance of the pattern used by the Clerk, is the standard practice used in this Court, exercised remaining challenges it had in order to obtain Evalina Adams, who would have been the next one in line going from top to bottom, or William Moxley, thinking we had more challenges, it turns out we did not. Nevertheless, Miss Adams would be the next called as customarily done. The Clerk instead, finding we had no more jurors, no more challenges, called out of turn a prospective juror who was fourth down the line. Fourth down the line. Not having a challenge left I object to the method employed by the clerk in choosing the last remaining juror. I feel that the Court in all its fairness and justness should instruct the clerk to call the next prospective juror in line, Evalina Adams."

The appellant's objection was overruled, and the juror called by the clerk was seated.

Under the peculiar circumstances of the case at bar, we see a violation of the due process of law to which the appellant was entitled by the arbitrary and capricious action of the court clerk. We do not establish any ironclad ritual to govern the calling of prospective jurors. We simply hold, under the facts of this case, that where the rules have been agreed upon, either explicitly or implicitly through settled usage, a defendant is entitled to rely upon those rules, unless good cause necessitates some departure therefrom.

Although the peremptory challenge, to be sure, only entitles a defendant to reject jurors and not to select others, there is at least some element of indirect selection inexorably at work in the very process of elimination. The right to reject need not be exercised in the dark, but is, under circumstances such as those here available, a right of informed and comparative rejection. When the appellant determined to spend his last three peremptories to challenge the first three of the next four persons whom he rightfully expected to be called, he was deciding that he liked the first three less than he liked the fourth. Had he known that he was comparing the three persons challenged with some other fourth person further down the list, he might well have preferred one, or more, of the rejected threesome to the unanticipated fourth. He was thus affirmatively misled in his three decisions to reject.

We hold that the arbitrary and unexplained action of the clerk in this case impaired the right of the appellant to the use of his peremptory challenges, free from manipulative countermeasures. That such impairment may be a denial of due process was made clear by the Supreme Court in *Swain v. Alabama, supra,* at 380 U. S. 218-219:

> "In contrast to the course in England, where both peremptory challenge and challenge for cause have fallen into disuse, peremptories were and are freely used and relied upon in this country, perhaps because juries here are drawn from a greater cross-section of a heterogeneous society. . . . The

persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury. . . . Although '[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] grant peremptory challenges,' . . . nonetheless the challenge is 'one of the most important of the rights secured to the accused,' . . . The denial or impairment of the right is reversible error without a showing of prejudice." (Citations omitted.)

In the wise expending of his available peremptory challenges, a defendant is entitled to the expectation that the rules which have, in practice, been operating will not strangely cease to operate once his options have been exhausted. That expectation was arbitrarily denied the appellant at bar.

*Judgments reversed; case remanded for a new trial.*