BRUCE HERBERT DEAN *v.* STATE OF MARYLAND

[No. 1533, September Term, 1979.]

*Decided October 8, 1980.*

The cause was argued before Lowe, Melvin and Mason, JJ.

*Clarence W. Sharp, Assigned Public Defender,* for appellant.

*Ray E. Stokes, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Sidney S. Campen, Jr., State's Attorney for Talbot County,* and *Jane Tolar O'Connor, Assistant State's Attorney for Talbot County,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

By a four count criminal information filed in the Circuit Court for Talbot County on July 5, 1979, the appellant, Bruce Herbert Dean, age 29, was charged with kidnapping four young females between the ages of 16 and 20. Each count named one of the young women as the victim. On November 16, 1979 he was found guilty by a jury of all four counts and subsequently sentenced on each count to prison terms totaling twelve years for the four offenses.

## I

On appeal Dean presents four questions. As one of the questions challenges the sufficiency of the evidence to support the kidnapping convictions, we shall consider that question first, for if we conclude that the trial judge erred in denying Dean's motion for judgment of acquittal, made at the close of all the evidence on insufficiency grounds, we must reverse without remand, in which event it would be unnecessary to consider any of the other issues raised. *See Burks v. United States,* 437 U.S. 1, 57 L. Ed. 2d 1 (1978); *Ricketts v. State,* 46 Md. App. 410, 417 A.2d 465 (1980).

The statute under which Dean was convicted (Md. Code, Art. 27, § 337) provides in pertinent part:

> "Every person, his counsellors, aiders or abettors, who shall be convicted of the crime of kidnapping and forcibly or fraudulently carrying or causing to be carried out of or within this State any person . . . with intent to have such person carried out of or within this State, or with the intent to have such person concealed within the State or without the State, shall be guilty of a felony and shall be sentenced to the penitentiary for not more than thirty years."

As this Court said in *Tate and Hall v. State,* 32 Md. App. 613, 616-617, 363 A.2d 622 (1976):

> "[W]hatever might be said of the common law

offense [of kidnapping] it is apparent, in light of the changes wrought by § 337, that the gist of the offense of kidnapping in Maryland is unlawful confinement coupled with transportation of the victim. *Cf. Collier v. Vaccaro,* 51 F.2d 17, 19 (4th Cir. 1931). The initial assaultive taking of the person and the carrying out of the state required at common law are not part of the § 337 offense."

The evidence in this case shows that at approximately 10:45 P.M., on May 21, 1979, while the four alleged victims were standing on the corner of South and Higgins Streets in Easton, Maryland, the appellant drove up in a pickup truck and stopped. The appellant's friend, one James Robinson, was a passenger in the truck. One of the girls knew Robinson, but the appellant was a stranger to all of them. The girls asked for a ride to a particular bar several blocks away. The two men agreed and all four got into the back of the truck. When they got to the bar they found it closed. The group then drove around Easton, with the girls still in the back of the pickup truck, "having a good time," singing and waving to their friends, and generally "partying." At one point, the truck stopped at a stop sign on the edge of town and all the girls got out. The men said they were on their way to a Six-Twelve store outside of town for beer and cigarettes. The girls told them of a liquor store that would be closer than the Six-Twelve store. The girls then got back in the truck and drove with the two men to the liquor store where beer and cigarettes were purchased. After socializing with other young people there the girls again got into the back of the truck and continued to joy-ride around Easton.

At some point thereafter, the men again indicated they were going to the Six-Twelve store — this time to get gasoline. There is evidence that the girls agreed to go with them on condition that they then be brought back to town and that the men agreed to that condition. Instead of stopping at the Six-Twelve store, however, the truck merely slowed down and continued farther out of town at a high rate of speed. The girls then became "suspicious" and frightened. Their requests to be let out of the truck were ignored. There

was evidence that the girls were told by Robinson that the "only way we could get out was the two of us to have sex with them"; otherwise, they would not be let out until the group arrived in Wilmington, Delaware. There was also evidence that Robinson told the girls that if they "tried anything, they had something under the front seat for us," and that the truck continued at a rapid rate without stopping at any stop signs. Finally, at a point approximately 20 miles from Easton, the youngest of the girls jumped out of the truck and was seriously injured. Appellant then stopped the truck and the other three girls got out and two of them went to the nearby home of Mr. Philip L. Walbert to seek assistance for their injured friend. After telling his son to telephone for the police and an ambulance, Walbert drove the two girls back to the scene where the injured girl lay in the road. When they arrived, the appellant and Robinson drove from the scene, but not before Walbert was able to get the license tag number of the truck.

Testifying in his own defense, Dean's version of the relevant events negated any notion that the girls were driven anywhere without their consent. On the ride out of Easton he said he heard no complaints from them and that he was driving them to his father's home to continue the "partying" he thought they were enjoying. He said he stopped at all stop signs.

Obviously, the jury, as was their prerogative, believed the victim's version. Keeping in mind that it is not our function to decide, on conflicting evidence, the guilt or innocence of an accused, we think the evidence was legally sufficient for the jury to have concluded beyond a reasonable doubt that what began as a voluntary joy-ride became a nonconsensual, and therefore unlawful, carrying away amounting to statutory kidnapping.

## II

Another issue raised by the appellant concerns the propriety of the jury selection process. He urges that his convictions must be reversed because he was "denied due

process of law by the action of the trial court in denying his challenge to the array and continuing the trial for sixteen days without completing jury selection and specifically in the midst of the peremptory challenge stage of the jury selection."

We agree that under the circumstances that existed the procedure employed by the trial court resulted in a denial of due process. We must therefore reverse the judgments of conviction and remand the case for a new trial.

The circumstances surrounding the jury selection were unusual. The case was called for trial on October 30, 1979. It appears that at a pre-trial conference a few days before, Dean's counsel had requested that he be allowed 80 peremptory challenges and the State 40, because the four count charging document contained four separate charges of kidnapping, on each of which Dean would have been subject to a sentence of twenty years or more of imprisonment. Without objection from the State, the judge granted the request. It further appears that the Clerk of the Court, who was also the "Jury Manager" (*see* § 8-202 of the Cts. & Jud. Proc. Article, Code, 1980 Repl. Vol.), was made aware of the possibility that 120 peremptory challenges would be used. Nevertheless, on the day of trial only 101 veniremen were present in court. It seems that the Clerk had given the Sheriff a list of "between 140 and 150" persons to be summoned for jury duty for this particular case, but had excused all but 101 for various reasons ("they were out of town, sickness, a lady ... whose mother that day had to have chemotherapy treatments, and things of that nature").

On the morning of trial, the trial judge and counsel met in chambers to discuss various preliminary matters. The following colloquy occurred concerning the jury panel:

"MR. BRAGER [Defense Counsel]: So we have 120 jurors?

THE COURT: No, we don't, we have 102.[1] We've

---

1. The record indicates that the correct number of veniremen on the list furnished counsel was 101 rather than 102.

had a job getting that many. We've gotten every warm body we could find.

MR. BRAGER: 102, and the defendant has 80 strikes, and the State has 40?

THE COURT: That's right.

MR. BRAGER: What happens if we run out of jurors?

MRS. O'CONNOR [The Prosecutor]: We won't. I'm not going to use 40 strikes.

MR. BRAGER: Okay, that's the answer."

During the voir dire stage of the jury selection process, 8 of the panel were excused for cause, leaving only 93 prospective jurors. Using the alternating challenge method (Md. Rule 753 b 2), the prosecutor and defense counsel proceeded to exercise their peremptory challenges. After the defense had exercised 64 peremptory challenges and the State 15, 12 jurors had been seated in the jury box but not sworn. At this point the judge reminded defense counsel that only two panelists remained and asked if he "insist[ed] on taking the 80." Counsel replied, "The defense fully insists on taking the 80." After further colloquy, the prosecutor objected "to the continued procedure" of allowing 80 peremptory challenges to the defense and 40 for the State. Although she had acquiesced in the procedure to that point, she told the judge that she "didn't check the rule, and did not look at the rule this morning, not thinking that we would approach the problem that we have this afternoon," but the rule (Maryland Rule 753 a 1), she said, should be interpreted to permit only 20 peremptory challenges for the defense and 10 for the State. She asked that one of the two remaining panelists be seated as an alternate and that the trial proceed. The judge replied:

"THE COURT: Your motion is overruled, as we do not interpret that Rule the way you move that we should. And furthermore, the motion comes entirely too late. If the Court were to be persuaded by your motion, then I believe the defendant could

successfully attack the convictions, if convictions did ensue, on the basis that the State was allowed more challenges than they had a right to have. You already used 14 [actually 15].

We pause here to note that the prosecutor was correct in her interpretation of Rule 753 a 1.[2] *See Mason v. State,* 12 Md. App. 655, 680-681, 280 A.2d 753 (1971), where, speaking for the Court, Judge Moylan said:

"The problem is one of elementary multiplication. . . . If the most serious charge on trial is a capital or penitentiary offense,[3] the multiplicand is twenty; the multiplier is not the number of charges on trial but rather the number of persons on trial — in this case one."

The alternate challenge procedure continued. The defense challenged one of the jurors already in the jury box and also the two remaining veniremen. At that point, there were 11 jurors seated but not sworn and no veniremen left. The judge postponed the case to November 15, 1979. Defense counsel objected to the postponement, but did not suggest or request at that time any alternative action that could have been taken by the judge. He did state, however, that "one of the reasons that we objected to the postponement is because these people [the 11 unsworn jurors] can easily read about this matter" during the sixteen day postponement. The judge said he would "caution them not to talk about it or read anything about it." He then told the 11 prospective

---

**2.** Rule 753 a 1 provides:

"1. Cases Involving Death, or Imprisonment for Life or Twenty Years or More.

In a trial in which the defendant is subject, on any single count, to a sentence of death, life imprisonment or twenty years or more of imprisonment, except for common law offenses for which no specific penalty is provided by statute, each defendant is permitted twenty peremptory challenges and the State is permitted ten peremptory challenges for each defendant."

**3.** The Rule as then written (former Rule 746) allowed a defendant 20 peremptory challenges where the offense is punishable by "confinement" of any duration, not 20 years as provided by the present Rule.

jurors: ". . . [T]he Court wants to make it abundantly clear to you that under no circumstances are you to discuss this case with anyone or to read anything about it. . . ."

On November 6, 1979, appellant filed a "Challenge to the Array" in which he objected to the "bifurcated jury selection process." He asked the Court, among other things, "to discontinue all jury selection proceedings at this time leaving the State to assume full responsibility for taking the next step necessary to prosecute the above captioned case." At the same time, the State, also apparently concerned about the propriety of the jury selection procedure being used and concerned also that the case might not be tried within the 120 day limitation of Md. Rule 746 a,[4] filed a "Motion to Change Trial Date." The State's motion reiterated its argument that a total of only 30 peremptory challenges should have been allowed (20 for the defendant and 10 for the State) and, therefore, "Neither the State nor the Defense will be able to obtain a fair and impartial jury and a fair and impartial trial from the venire panel available." The motion asked that the case be postponed until after February 25, 1980, when a "new petit jury panel will be qualified" at which time "a fair and impartial jury may be impaneled with the proper number of strikes used. . . ."

A hearing on appellant's motion challenging the array was held on November 7, 1979. At the hearing the State withdrew its motion to change the trial date, stating it now believed that the lack of objection by the State or by the defense to the procedure that had been used to that point in the proceedings "has been tantamount to an agreement [by all concerned that the defense was entitled to 80 peremptory challenges and the State 40]." The judge then acknowledged that his initial interpretation of Md. Rule 753 a 1 was in error, citing *Mason v. State, supra,* but said that "now that

4. Under the Rule as then written, the deadline for trial was November 16, 1979 and section b of the Rule provided that upon motion and for "extraordinary cause shown" the date may be changed by the county administrative judge or his designee. By rule amendment, effective November 16, 1979, the time was extended to 180 days, and by statute (Laws of Md. 1980, ch. 378) effective July 1, 1980, the standard for permissible continuance was changed to "good cause shown" rather than "extraordinary cause shown."

we're embarked on this process of 80—40, it seems to me that to be fair to both sides, I must continue to pursue this course." He rejected, however, the principal argument made by the defense concerning the bifurcation of the peremptory challenge stage of the jury selection process. He ordered the process to continue on November 15th "to allow both sides to exercise all their peremptory challenges if they care to do so."

On November 14th, the appellant filed a motion for reargument on his challenge to the array. This motion was heard and denied on the morning of November 15th. At that time the State and the defense had been presented with a list of additional prospective jurors containing 48 names. It appears that the names were taken from the "master list" of those who had been qualified for jury duty several months before and included some of the persons who had been excused before the list of 101 names was presented to the parties on October 30th. At the hearing, defense counsel took the witness stand and under oath explained his objection to the bifurcation of the peremptory challenge stage of the jury selection process as follows:

> "THE WITNESS: I struck the jurors under the circumstances, according to the list that I had available on that day. Those jurors were struck. Then we're presented with another jury list of 48 jury members today. Now, I've looked this jury list over, and read it in conjunction with the other jury list.
>
> And it's my contention that I would have kept some of the jurors that I struck on October the [30th], as opposed to some of the jurors that we're presented with today. And I would like to have those jurors back, but I know I can't get them back, according to the law.
>
> THE COURT: Let me put a question to you. Do you know anybody on that list?
>
> THE WITNESS: I don't know them personally. But their backgrounds would indicate to me that I would not want them on the jury. We're interested in a certain type of juror.

THE COURT: I understand that.

THE WITNESS: Who will associate with the type of crime that we have here. And I know elderly people, and maybe females would not be the kind of jurors that I would want."

In denying the defense motion the judge reiterated his belief that although he had agreed to allow the defendant 80 challenges he had done so erroneously and "had we gone according to the rules, you would have gotten your jury out of the veniremen that were proposed on October the [30th]." The judge had earlier opined that "if we had run out of what you are entitled to, there might be some merit in your argument." Under the circumstances, however, he found no prejudicial irregularity in the proceedings.

After voir dire questions were asked of those on the second jury list and a number excused for cause, the peremptory challenge process continued where it left off on October 30th. After both the State and the defense exercised additional peremptory challenges a full jury and one alternate were finally sworn. The defense had exercised a total of 80 challenges and the State 17.

## III

Citing *Spencer v. State,* 20 Md. App. 201, 314 A.2d 727 (1974), the appellant argues that the bifurcated nature of the peremptory challenge stage of the jury selection process deprived him of the "right of informed and comparative rejection." Speaking for this Court, Judge Moylan said in *Spencer,* at 208:

"Although the peremptory challenge, to be sure, only entitles a defendant to reject jurors and not to select others, there is at least some element of indirect selection inexorably at work in the very process of elimination. The right to reject need not be exercised in the dark, but is, under circumstances such as those here available, a right of informed and comparative rejection."

Although the circumstances in *Spencer* were different

from those in the present case, we think the same principles apply. Section 8-301 (c) of the Cts. & Jud. Proc. Article provides: "The clerk of the court shall provide a sufficient number of prospective jurors to allow the parties to exercise the peremptory challenges permitted by this section or Rule 746 [now Rule 753]." With it known to all concerned, including the clerk, that at least 132 prospective jurors would be needed to enable the defense and the State to exercise the number of challenges that had been agreed upon, the furnishing by the clerk of only 101 veniremen obviously violated the spirit, if not the letter, of this statutory mandate. It is true that the clerk called the shortage to the attention of defense counsel who in turn inquired of the court, "What happens if we run out of jurors?" That the list of 101 veniremen would be exhausted if both sides exercised an aggregate of 120 peremptory challenges must have been obvious to everyone. It was at this point, before the selection process began, that the prosecutor assured the court and defense counsel that "we won't [run out]" because "I'm not going to use 40 strikes." Consequently, we do not criticize the court for not invoking at that point the provisions of Section 8-208 of the Cts. & Jud. Proc. Article:

> "(c) *Unanticipated shortage of available petit jurors.* — If there is an unanticipated shortage of available petit jurors in the qualified jury wheel, the court may require the sheriff to summon a sufficient number of petit jurors selected at random from the voter registration lists in a manner ordered by the court consistent with §§ 8-102 and 8-103 of this title. (An. Code 1957, art. 51, §§ 7, 9; 1973, 1st Sp. Sess., ch. 2, § 1; 1978, ch. 544.)"

We think, however, that when the list of 101 veniremen was exhausted before the defense had exercised its agreed upon peremptory challenges, the court should have granted appellant's challenge to the "second" panel of prospective jurors and commenced the selection process anew with a sufficient number of prospective jurors to allow the parties to exercise the peremptory challenges permitted by Rule 753, *i.e.,* 20 for the defense and 10 for the State.

We recognize, of course, that both the appellant and the State received more peremptory challenges than they were entitled to under Rule 753. But this fact we consider irrelevant under the circumstances. Although assured by the State that the original list of 101 veniremen would not be exhausted before the appellant exercised his 80 peremptory challenges, the list was nevertheless exhausted when he still had 13 challenges left — to which the State and the court had agreed he was entitled under the previously established ground rules. It may well have been that the State did not foresee that eight of the 101 veniremen would be struck for cause or that it was hoping the appellant would not use all 80 challenges. The fact remains that through no fault of the appellant the list was exhausted before all 80 challenges were exercised. At that point to require the remaining challenges to be made from a hitherto unknown list of prospective jurors deprived the appellant of the right of "informed and comparative rejection", *Spencer v. State, supra,* at 208, and to that extent impaired his right to the use of peremptory challenges. Such impairment, we think, requires that the judgments in this case be reversed as a denial of due process. *Spencer v. State, supra; see also Swain v. Alabama,* 380 U.S. 202 (1965), where the Supreme Court recognized that the right of comparative rejection is an important aspect of the right to peremptory challenges and that, "the denial or *impairment of the right* [to challenge] is reversible error without a showing of prejudice." (Emphasis added).

## IV

In view of our disposition of the case, it is unnecessary to consider the remaining issues presented by the appellant.

*Judgments reversed; case remanded for new trial.*

*Costs are not reallocated as part of the judgment of this court pursuant to Maryland Rule 1082 f.*