698 A.2d 1087

**Donald E. BOOZE**

v.

**STATE of Maryland.**

**No. 105, Sept. Term, 1996.**

Court of Appeals of Maryland.

Aug. 26, 1997.

Michael R. Malloy, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Gary E. Bair, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

The question put to us by petitioner, Donald Booze, is whether a defendant in a criminal case who has elected a jury trial is entitled either by due process or by Maryland law to the right of "informed and comparative rejection" of prospective jurors. We need not answer such a broad question. We shall conclude that what the Circuit Court for Baltimore City did in this case violated the clear mandate of Maryland Rule 4–312(g) and, because that violation was prejudicial to Booze, we shall reverse the judgment of the Court of Special Appeals, which affirmed the judgment of the circuit court.

## BACKGROUND

### (1)

Petitioner and a confederate, Alan Snead, were charged with the murders of Antonio Henderson and Isaac Durant. In November, 1991, they were tried together in the Circuit Court for Baltimore City and convicted on two counts of first degree murder and unlawful use of a handgun. Those judgments were reversed on appeal. *See Booze v. State*, 94 Md.App. 331, 617 A.2d 642 (1993), *aff'd, State v. Booze*, 334 Md. 64, 637 A.2d 1214 (1994). The problem in that case was that the State was allowed to hold back an important witness until after the defense had been presented. This Court and the Court of Special Appeals held that, under the circumstances, it was an abuse of discretion for the court to have allowed the State to reopen its case for that purpose.

The case returned to the circuit court for retrial, and, once again, the State decided to try Booze and Snead jointly. After a 10–day trial extending from April 14 through April 28, 1995, each was again convicted of two counts of first degree murder and one count of felonious use of a handgun, and each received two consecutive life sentences for the murders and a consecutive 10–year sentence for the handgun violation. In their appeal to the Court of Special Appeals, Booze and Snead presented a number of issues, headed by the complaint that the State had been allowed to exercise peremptory strikes against two African–American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The appellate court concluded that, with respect to one of the jurors, the trial court had failed to afford the State an opportunity to tender a race-neutral reason for its strike, but that only Snead had objected to that strike. Finding no merit in any of the other complaints made by the appellants, it vacated the judgments against Snead and remanded for further proceedings on the *Batson* issue as to him but affirmed the judgments against Booze. *Booze v. State*, 111 Md.App. 208, 681 A.2d 534 (1996). We granted Booze's petition for *certiorari* to consider one of the other issues raised by him— whether due process or Maryland Rule 4–312(g) was violated by the court's insistence that the parties commence the exercise of peremptory strikes when there was an insufficient venire to allow all of the strikes to be exercised and a sixteen-person jury (twelve jurors and four alternates) to be selected.

(2)

The case on remand was called for trial at about 11:25 on the morning of April 14, 1995, which happened to be Good Friday. Because the defendants were facing life imprisonment if convicted of the murder charges, they were each entitled to 20 peremptory challenges and, because there were two defendants, the State was also entitled to 20. Md. Rule

4–313(a)(2).[1]  The initial venire consisted of 94 persons.

。The court commenced voir dire examination by asking whether any of the jurors knew about the case or knew counsel, and, based on positive responses to those questions, five jurors were eventually excused, leaving 89 in the venire. Notwithstanding concerns expressed both by defense counsel and the prosecutor as to the timing of the question, the judge then insisted on asking whether any member of the panel knew of "any reason whatsoever, including religious reasons, or not being able to judge individuals or cases, any reason from the beginning of the world until right now why you cannot be fair."  Twenty-nine persons, including two who would be excused based on familiarity with counsel or the facts of the case, responded in the affirmative, at which point the court recessed until 2:39 p.m.[2]

---

1.  It is not clear when the decision was made to have four alternates. Under Md. Rule 4–313(a)(5), each of the defendants was entitled to two peremptory strikes for each alternate and, as there were two defendants, the State was also entitled to eight. Thus, an aggregate of 24 additional peremptory challenges was available with respect to the alternates, making the total number of peremptory challenges 84.

2.  Counsels' concern was that such a general question should not be asked until more particular questions were asked, so that the jurors would have a better opportunity to reflect on their attitudes.  One of the attorneys suggested that it was a question asked in a vacuum.  The court's view was that it would be obliged to excuse any juror who answered the question affirmatively in any event and that it might as well "shake beans right now and send them somewhere else."  As was amply demonstrated by what followed, there are two problems with asking such a general question prior to focusing on more specific grounds.  The first problem is one of simple efficiency; an affirmative response to such a general question necessarily requires further examination to determine the basis for the answer, and some of that individual examination may prove unnecessary if more particular questions are first put to the panel.  Of the 29 persons who responded affirmatively to the general question, 19 responded to the more particular ensuing questions—that they knew counsel or witnesses, that they had been victims of a crime or had been convicted of a crime, that they or a close relative were employed by a law enforcement agency, or, in the case of one, that he or she would give greater or lesser weight to the testimony of a police officer than that of a civilian witness.  The second problem is that such a general question asked early in the process gives persons who have no particular bias but for other reasons do not wish to serve

When court resumed, the judge expressed surprise that so many persons had responded to the general question. Booze's attorney noted that, if those people had to be excused, there might not be enough prospective jurors left to select a jury, given the 60 (actually 84) peremptory strikes that were available. Both defense counsel added that, under the doctrine of comparative rejection, which they believed had been accepted by the Maryland courts, they were entitled to select the jury from one panel. Counsel for Booze, in particular, asked that, if the panel remaining after voir dire was insufficient, the court dismiss the panel and start again with a new panel "so that we can look at the next panel with the same eyes that we had to look at these ones, and judge the next panel the same way we have to judge these ones." The court dismissed the notion of comparative rejection out of hand, concluding that it was "no good until the Court of Appeals tells me it's good...."

At 2:49 p.m., the jury was brought back into the courtroom and asked further voir dire questions. Three panel members knew potential witnesses. One said he or she would give greater or lesser weight to the testimony of a police officer than to a civilian witness, and 19 said that they or a close relative had been a member of a law enforcement agency. Forty-three said they had been victims of a crime or had been convicted of a crime, and 36 sought release on hardship grounds, notwithstanding that, when asked by a juror to define "hardship," the court declined to do so. The court then went until 5:27 p.m. conducting individual voir dire at the bench with respect to those persons who had given an affirma-

---

as jurors an easy way to be excused. Of the 10 persons who did not respond to another potentially disqualifying question, five asked to be excused because of hardship. The relevant yield from the general question was thus only five persons, although that could not be determined until all of the other questions were asked and the answers correlated in some way. Although the manner of conducting voir dire examination remains within the discretion of the court, the court would be well advised to hold a catch-all question such as this one to the end and then have it speak to any other reason, not covered by the more specific inquiries.

tive answer, excusing 44 persons for cause and refusing to excuse 22 others. During this examination, the court was informed that, because it was Good Friday, the court offices had closed at 2:45, and that jurors who were excused should be released rather than returned to the jury assembly room. The prosecutor had asked to be excused at 5:45 because that was when her "ride" would be ready.

At the conclusion of the individual voir dire, the prosecutor observed that, with the strikes for cause, "we don't have enough of a pool." Defense counsel agreed, there being 45 jurors left in the pool and the parties having a total of 60 peremptory strikes (84 if alternates are taken into account). Nonetheless, the court insisted on commencing the peremptory challenge process. That process went on for another hour, until 6:28 p.m. At 5:54, after defense counsel had stricken 17 jurors between them and the State had stricken five, a *Batson* challenge was made with respect to the State's strikes, and several minutes were consumed with resolving that issue. After some additional strikes, another *Batson* challenge was made and resolved. Finally, at 6:15 p.m., the panel was exhausted with only 10 jurors selected. The State had used eight peremptory challenges, Snead had used 16, and Booze had used ten. Noting that "the courthouse for all practical purposes closed at three," the court stated that jury selection would resume on Monday. Defense counsel once again complained about the loss of comparative rejection.

When trial resumed on Monday, counsel repeated their objection, pointing out that, if expected to make intelligent choices in exercising peremptory challenges, they needed to observe and have before them the entire panel from which prospective jurors could come and that it was unfair to require them to exercise strikes from a limited panel and then have to face a different panel having already exhausted some of their strikes. Counsel for Booze noted that he had been required to exercise 10 of his 20 strikes without ever having seen or been able to voir dire the new panel, and he asked that those 10 strikes be restored—that he be given 20 peremptory challenges to exercise against the new panel. The court rejected

that request, as it had earlier rejected his request for an entirely new panel, and proceeded with further jury selection.

Forty-four new prospective jurors, from a second panel, were sworn and subjected to voir dire. Thirteen were excused for cause. The jurors who had survived from Friday were then brought into the courtroom, and the peremptory challenge process continued. After the prosecutor used nine of her 12 remaining challenges, Snead used three of the four he had left, and Booze used nine of the ten that he had remaining, a jury of 12 was selected. A third panel was then summoned from which four alternates were chosen. Booze accepted the jury "[s]ubject to prior intentions."

Booze pressed his comparative rejection argument in the Court of Special Appeals, relying principally on two earlier decisions of that court—*Spencer v. State*, 20 Md.App. 201, 314 A.2d 727 (1974), and *Dean v. State*, 46 Md.App. 536, 420 A.2d 288 (1980), *cert. denied*, 289 Md. 735 (1981). The court acknowledged that *Dean* did indeed support his argument but decided that the case constituted an unwarranted extension of *Spencer* and therefore overruled it. Although not rejecting entirely the doctrine of comparative rejection, the court held that, in this case, there was no violation of Booze's rights, in part because he was not "affirmatively misled" in any decision to reject a juror and in part because he did not exhaust the peremptory challenges that he had; when he conditionally accepted the jury, prior to the selection of alternates, he still had one challenge unused. *Booze v. State, supra,* 111 Md. App. at 231–32, 681 A.2d at 545–46.

## DISCUSSION

### Peremptory Challenges And Comparative Rejection

As we indicated at the outset, we shall decide this case under the plain wording of Rule 4–312(g), which states:

"*Before the exercise of peremptory challenges*, the court shall designate from the jury list those jurors who have qualified after examination. *The number designated shall be sufficient to provide the number of jurors and alternates*

*to be sworn after allowing for the exercise of peremptory challenges pursuant to Rule 4–313.* The court shall at the same time prescribe the order to be followed in selecting the jurors and alternate jurors from the list."

(Emphasis added).

Rule 4–312(g) sets forth a clear and required procedure that simply was not followed in this case. It directs the court to provide for the parties a list of jurors who have survived challenges for cause, to ensure that the list is sufficiently large to permit a jury (and alternates) to be selected after allowing for the exercise of peremptory challenges, and to provide that list "[b]efore the exercise of peremptory challenges." There is nothing arcane or ambiguous about that direction, and, as an examination of its history and development will reveal, it has an important purpose.

The right of both the defendant and the Government to challenge prospective jurors without assigning any reason is an ancient one, dating back, in England, to the Thirteenth Century. As Judge Moylan noted in *Spencer v. State, supra,* 20 Md.App. at 202, 314 A.2d at 728, there are references to the practice in the writings of Bracton and Britton. The first statute on the subject, enacted in 1305 (33 Edw. 1, Stat. 4), abrogated the right of the Crown to peremptory challenges and limited those available to the defendant to 35. In 1533, that number was reduced to 20, except in cases of treason. *See,* in general, *Turpin v. State,* 55 Md. 462, 464–465 (1880); *Spencer v. State, supra,* 20 Md.App. 201, 314 A.2d 727; *also* 1 Julian J. Alexander, *British Statutes in Force in Maryland,* 212–14 (Ward Baldwin Coe ed., M. Curlander 2d ed. 1912).[3]

---

**3.** As we pointed out in *Turpin v. State, supra,* 55 Md. 462, although the 1305 statute abrogated the right of the Crown to peremptory challenges, as such, it was later construed to allow a practice that took on some aspects of peremptory challenges. As the practice was described in *Mansell v. The Queen,* 8 E. & B. 54 (1857), cited in *Turpin,* when a juror was called from the panel, the Crown was permitted to ask the juror to "stand by" and not be seated until the whole panel was gone through and an acceptable jury could not be chosen without that person. Only then was the Crown required either to exercise a chal-

Thus it was that, when Maryland was founded as a colony, the only peremptory challenges were those allowed to the defendant—35 in cases of treason and 20 in other felony cases. The defendant's right to 20 challenges in non-treason felony cases was referred to in several statutes enacted by the Provincial Assembly (*see* Acts of 1737, ch. 2; Acts of 1744, ch. 20; Acts of 1751, ch. 14) and was expressly conferred in the first post-Revolutionary codification of the State criminal law and procedure in 1809. Acts of 1809, ch. 138, § 13.

The 1809 statute afforded a defendant 20 peremptory challenges in capital and serious felony cases. In a continuation of the English practice, no provision was made for any peremptory challenges by the State. It was not until 1860 that the State was allowed peremptory challenges in criminal cases, and then only in Baltimore City, where it was allowed five. *See* Acts of 1860, ch. 308, § 15. In 1872, the State became entitled, in all prosecutions in which the defendant had a right to 20 challenges, to four peremptory challenges. Acts of 1872, ch. 40, § 15. Except for amendments increasing the number of challenges allowed to the State to 10 and expansion of the right to 20 challenges to any case in which the defendant was facing imprisonment in the penitentiary, that statute remained intact until it was repealed in 1963.

A number of cases arose during those early years regarding the function of peremptory challenges and the method of exercising them. One of the earliest, *Burk v. State*, 2 H. & J. 426 (1809), touched obliquely on the issue now before us, although the issue was not raised in the context of any articulated argument of comparative rejection. Burk, being charged with rape, was entitled to 20 peremptory challenges. The initial panel consisted of 24 persons; nine were seated, and 15 were peremptorily excused by Burk. On the State's

---

lenge for cause or allow the juror to be sworn. Although the ultimate challenge could only be for cause, the Crown was not obliged to give a reason for asking that a prospective juror "stand by." If a jury could be picked from succeeding jurors, the juror asked to "stand by" would be excused, even if not excusable for cause.

motion, and without objection from Burk, the court ordered the sheriff to summon only three additional jurors, two of whom were seated and one challenged. Without objection, the sheriff then summoned one additional juror, who was seated. On appeal from his conviction, Burk complained that, because he had five peremptory challenges remaining after the 24–member panel was exhausted, the sheriff should have summoned at least eight additional jurors the first time and, as he still had four challenges left after the three additional jurors were exhausted, the sheriff should have summoned five the second time.

This Court found Burk's argument "unsupported by authority." *Id.* at 427. Our predecessors acknowledged that the judge, if he wished, could have summoned a larger number of prospective jurors, to prevent any delay that might occur if the defendant struck a juror, and that he may well have done so had such a request been made, but the Court made clear that, apart from the lack of any objection, there was no requirement in any event that the call be sufficient "to supply the deficiency, after the party has completed his challenges." *Id.* at 428.

The 1809 statute drew a distinction, with respect to the summoning of jurors, between cases in which the defendant had a right to peremptory challenges and those in which there was no such right. Section 13, which provided for the 20 peremptory challenges, said nothing about how many jurors were to be summoned or how the challenges were to be exercised. Section 14, on the other hand, provided that, in cases where there was no right of peremptory challenge, the clerk was to summon 20 jurors and write their names on two lists, one for each party. Each party was then to strike up to four names from the list. If each struck four, the remaining 12 would constitute the jury; if less than eight names were stricken, the clerk would make the additional strikes to reduce the list to 12. The law allowed the parties, by mutual consent, to dispense with the calling of 20 jurors and proceed in

accordance with the prior practice.[4] Although the four strikes allowed to each party were not regarded as peremptory strikes, it would seem that they served the same purpose, in that no explanation was required to be given for them. That dichotomy remained part of the Maryland statutory law until 1963.

In *Turpin v. State, supra,* 55 Md. 462, which arose after the State acquired the right to four peremptory challenges, the defendant complained that, when a juror was called from the panel, the court insisted that he exercise his peremptory challenge first, before calling upon the State to exercise its challenge. Turpin argued that that practice improperly allowed the State to deny him jurors of his choice. Based largely on English precedent, the views of Justice Story announced in *U.S. v. Marchant,* 25 U.S. 480, 6 L.Ed. 700, 12 Wheat. 480 (1827), and practice in Maryland and in other American States, this Court rejected that argument, concluding that the defendant's right of peremptory challenge is "not a right to *select* the jurors, but simply to *reject* such as he may consider objectionable." *Turpin, supra,* at 469. *See also Rogers v. State,* 89 Md. 424, 43 A. 922 (1899).

By 1961, the statutory law had evolved to the point that, in a case in which a defendant was subject to a penalty of death or confinement in the penitentiary, the defendant was entitled to 20 peremptory challenges and the State was entitled to 10 for each such defendant. In any other case, neither party had a right to peremptory challenges, as such, although, as explained above, each was entitled to strike four names from a list of 20 without explanation. *See* Maryland Code (1957), Article 51, §§ 18 and 24. In 1961, this Court revised the rules dealing with criminal procedure and, as part of that revision,

---

4. The effect of exercising that right was never made clear in the statute. In 1981, a discussion arose within this Court's Standing Committee on Rules of Practice and Procedure in connection with a similar provision proposed for inclusion in a rule of civil procedure, and there seemed to be a tacit consensus that the exercise of that right, to dispense with the drawing of a panel of 20, "amounts in effect to a waiver of peremptory challenges." *See* Minutes of February 12, 1981 at 12.

modified the then-current statutory provisions dealing with peremptory challenges. In Rule 746, we retained the right of the defendant to 20 challenges, and of the State to 10 for each defendant, in cases where the defendant was subject to a penalty of death or confinement in the penitentiary, but we revised what was then § 18 of Article 51 to provide for four peremptory challenges for each side in a non-capital, non-penitentiary case. That conversion of the earlier practice of striking four names from the list into actual peremptory challenges was significant to the extent that, in §§ b. and c. of the rule, we provided that, at the defendant's election, peremptory challenges would be made alternately, beginning with the State (rather than simultaneously from separate, but identical lists) and that a peremptory challenge may be exercised as a matter of right until the time the jury was sworn.[5]

In 1963, the General Assembly acquiesced in the changes made by Rule 746 by modifying § 18 and repealing § 24 of Article 51. Section 18 was amended in two relevant respects. First, the Legislature recognized the right of four peremptory challenges in cases not involving death or confinement in the penitentiary and directed the clerk, in those cases, to continue to draw 20 names so that the parties could each exercise their four challenges in accordance with the rule. In the other cases, where 20 and 10 challenges were permitted, the law required that "such additional names shall be added to the panel of petit jurors as may be necessary to enable the parties to exercise their right of peremptory challenge in accordance with Rule 746...." Acts of 1963, ch. 558, § 11; Md.Code (1957, 1964 Repl.Vol.), Art. 51, § 18. With the enactment of the Courts and Judicial Proceedings Article in 1973, as part of the Code Revision process, that provision was consolidated as § 8–301(c) of the new article, to provide that "[t]he clerk of

---

5. That part of the rule, allowing the parties to strike jurors who had already been tentatively seated, simply recognized a practice of long standing. In *Rogers v. State, supra,* 89 Md. at 426, 43 A. 922, we observed that, even by 1899, it was "the settled practice in this State that the right of peremptory challenge can be exercised until the juror has been sworn to try the case."

the court shall provide a sufficient number of prospective jurors to allow the parties to exercise the peremptory challenges permitted by this section or Rule 746."

Upon the promulgation of Rule 746 and the conforming statutory amendments, both parties had the right to exercise peremptory challenges in all criminal cases triable before a jury, the number depending only on whether the defendant was facing death or incarceration in the penitentiary. Only three matters of procedure were dealt with, however—the statutory direction that the clerk provide a sufficient number of prospective jurors to allow the parties to make their challenges and the provisions in the rule that, at the defendant's request, the challenges would be made alternately and that a juror could be peremptorily challenged until the jury was sworn. In 1971, we modified Rule 746 to reduce to four the number of peremptory challenges when the defendant was facing less than 20 years in prison. That was the construct in effect when, in 1974, the Court of Special Appeals decided *Spencer v. State, supra,* 20 Md.App. 201, 314 A.2d 727.

The defendant in that case was entitled to 20 peremptory challenges and the State was entitled to 10. The parties were presented with three separate lists, containing in the aggregate 50 prospective jurors, all of whom remained in the pool after voir dire examination. Beginning with the first list, the clerk called the names of the jurors in the order they appeared on the list; the State used three challenges and the defendant used 10. Eight jurors were tentatively selected. The clerk then turned to the second list, again calling jurors in the order in which their names appeared. Through the use of additional challenges, both from that list and as to jurors already tentatively seated, the second list was exhausted with only 11 jurors seated. The State had used its 10 challenges, but the defendant still had three remaining. Counsel examined the first four names on the third list and decided that the fourth juror was better than the first three, so he used his remaining challenges to strike the first three names. With no explanation, the clerk, instead of calling the fourth person, as counsel had expected, jumped over the next three persons and

called the eighth person on the list, and the defendant objected, unsuccessfully.

The Court of Special Appeals reversed. Although eschewing any "ironclad ritual" to govern the calling of jurors, it held that, "where the rules have been agreed upon, either explicitly or implicitly through settled usage, a defendant is entitled to rely upon those rules, unless good cause necessitates some departure therefrom" and that, under the peculiar circumstances of that case, the "arbitrary and capricious action of the court clerk" constituted a violation of Spencer's right to due process of law. *Id.* at 208, 314 A.2d at 731–32. The due process violation stemmed from the court's conclusion that Spencer had been affirmatively misled into believing that the clerk would continue to call the names in order. It observed that, although the right of peremptory challenge entitles a defendant only to reject jurors and not to select others, "there is at least some element of indirect selection inexorably at work in the very process of elimination" and that "[t]he right to reject need not be exercised in the dark, but is, under circumstances such as those here available, a right of informed and comparative rejection." *Id.* In using his last challenges to reject the first three jurors on the third list, said the court, Spencer was deciding that he liked them less than he liked the fourth, and that, "had he known that he was comparing the three persons challenged with some other fourth person further down the list, he might well have preferred one, or more, of the rejected threesome to the unanticipated fourth." *Id.* Relying on *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), for the proposition that impairment of the right of peremptory challenge constitutes a violation of due process of law, the court declared that, in exercising that right, a defendant is entitled to expect that the rules that have been operating "will not strangely cease to operate once his options haven been exhausted." *Id.* at 209, 314 A.2d 727.

In 1977, we again rewrote the rules on criminal procedure, replacing Rule 746 with Rule 753. Except to allow a defendant two additional peremptory challenges for each alternate juror to be chosen (and the State one) and to amplify the

method of exercising challenges alternately, the changes were essentially ones of style. That rule was in effect when the Court of Special Appeals decided *Dean v. State, supra,* 46 Md.App. 536, 420 A.2d 288, which involved a situation somewhat closer to the one at hand.

The defendant in *Dean* was charged with four kidnappings, all arising from a single incident. In light of the four charges, each carrying a possible 20-year sentence, he was able to persuade the court, with initial acquiescence by the State, that he was entitled to 80 peremptory challenges and that the State was entitled to 40, and the case proceeded on that assumption.[6] When the case was first called for trial, only 101 jurors were available, and, when Dean asked what would happen if, with 120 peremptory strikes, they ran out of jurors, the prosecutor said that it would not be a problem because she did not intend to use her 40 strikes. After Dean exercised 67 challenges and the State exercised 15, the venire was exhausted with only 11 jurors tentatively seated. The case was then postponed for two weeks, over Dean's objection.

Prior to resumption of the trial, Dean objected to the array, complaining about the "bifurcated jury selection process." He renewed his objection when trial resumed and the parties were presented with a new list of 48 jurors, which included the names of some jurors who had been on the earlier list of 101 and had been excused. Dean's counsel complained that, had the new list been before him earlier, he would not have stricken some of the jurors he struck from the first list. The court overruled his objection and jury selection proceeded. Dean eventually used all of his 80 strikes.

The Court of Special Appeals reversed. It noted the requirement of § 8–301(c) of the Courts and Judicial Proceed-

---

6. The State later objected, urging that Dean was entitled to only 20 peremptory challenges and the State 10, but the court, though recognizing that the State was correct, nonetheless proceeded on the 80/40 basis for a variety of practical reasons, not the least of which was that, by the time the error was caught, the State had already used 15 peremptory challenges.

ings Article (now § 8–301(e) of that article) that the clerk provide a sufficient number of jurors to allow the parties to exercise the peremptory challenges permitted by law and declared that, with a minimum of 132 jurors needed in light of the 120 challenges then believed permissible, the clerk violated at least the spirit, if not the mandate, of the statute by supplying only 101 jurors. Although, in light of the State's undertaking not to exercise its 40 challenges, it was not expected that the available list would be exhausted, when the unexpected occurred, the court held that, "to require the remaining challenges to be made from a hitherto unknown list of prospective jurors deprived the appellant of the right to 'informed and comparative rejection.'" *Id.* at 547, 420 A.2d at 294–95, citing *Spencer v. State* and *Swain v. Alabama.*

We touched upon, but distinguished, *Spencer v. State* in *Pollitt v. State,* 344 Md. 318, 686 A.2d 629 (1996). There, immediately after a jury was selected and sworn, without alternates, the court, with the consent of the parties, excused one juror when it discovered that she had difficulty hearing. The parties agreed that the court would select a replacement from the venire, which was still in the courtroom. The court then chose the next person on the list, to which Pollitt objected, urging that, as the selection was essentially that of an alternate, he was entitled to an additional peremptory challenge. The court disagreed.

In the Court of Special Appeals, and ultimately in this Court, Pollitt argued both that the court's procedure denied him a right of comparative rejection and that it violated his right to an additional challenge with respect to alternates. In response to his first argument, we cited and discussed *Spencer v. State* but noted that the decision there rested on Spencer's having been "affirmatively misled" by the "arbitrary and unexplained" action of the clerk in departing from the standard procedure used up to that point, and that no such conduct had occurred in Pollitt's case. In thus distinguishing *Spencer* (and in not even citing *Dean* ) we neither accepted nor rejected the underlying doctrine of comparative rejection, at least as a component of due process of law. We reversed

on the ground that, under the circumstances, the court had three possible choices—declare a mistrial, proceed with 11 jurors, or replace the juror with another—but that the latter two options required the consent of the parties. As no one sought to proceed with 11 jurors and as there was no consent by Pollitt to selecting another juror, absent his being allowed an additional peremptory challenge, the court's only effective option was to declare a mistrial.

As noted, the Court of Special Appeals in this case disavowed *Dean*, declaring that the *Dean* court had "misread *Swain*" and "was overly zealous in extending *Spencer.*" *Booze v. State, supra,* 111 Md.App. at 231, 681 A.2d at 545.

We have recounted the statutory and rule history in some detail because the cases relied upon—particularly *Spencer* and *Dean*—have to be viewed in the context of what the prevailing law was when they were decided. We thus turn to the final development, up to this point, which, as we have indicated, really governs the matter.

In 1984, this Court, through the adoption of the Eighty–Seventh Report of its Standing Committee on Rules of Practice and Procedure, once again substantially rewrote the rules dealing with criminal procedure. As part of that revision, Rule 4–312, dealing generally with jury selection in criminal cases, was adopted. Rule 4–312 combined features of former rules 751, 752, 753, and 754 but also introduced several new provisions, the overall thrust of which was to give the parties more information about prospective jurors and thus allow them to make more informed choices in selecting the jury. In § (c), a requirement was added that, before the examination of jurors commenced, each party be provided with a list of jurors that included, as to each juror, the juror's name, age, sex, education, occupation, occupation of spouse, and any other information required by the county jury plan. Section (d) added the provision that, upon request of a party, the clerk was to call the roll of the jury and have each juror stand and be identified when called by name. Section (f) introduced a requirement that, if it appeared that the number of jurors of

the regular panel might be insufficient, the court may direct that additional jurors be called. That provision meshed with the new requirement of § (g) that, prior to the exercise of peremptory challenges, the court must provide a list of qualified jurors sufficient to allow a jury and alternates to be selected after the exercise of peremptory challenges.

These various provisions, including § (g), need to be read together, and, when so read, they communicate clearly this Court's intent that, to the extent possible, the parties should have before them the entire pool of prospective jurors before being required to exercise any of their peremptory challenges. That intent is not, in any sense, inconsistent with the basic notion that the function of peremptory challenges is to *reject* rather than to *select* jurors. It simply manifests the belief that the parties should have the right to exercise their rejections intelligently and strategically, and that they can better do that if they have the full panel of prospective jurors before them. This is not necessarily a matter of due process. By adopting Rule 4–312(g), we have made that intent a mandate of State judicial policy, and, in the absence of a waiver or other compelling circumstance, we insist that it be followed. In this case, it was not followed, and there was neither a waiver nor any justification for the deviation.

### Prejudice

As we observed, when it first appeared, on Friday, that there might not be enough jurors left in the pool to allow for 60 peremptory challenges (much less 84), Booze and Snead asked that they not be required to exercise their challenges until additional jurors were provided. Having been rebuffed in their attempt to have the matter deferred, Booze asked on Monday that the 10 challenges that he used on Friday be restored to him. That too was denied. He then proceeded to use nine of the ten challenges he had remaining and thus had one unexercised challenge left when, subject to his prior "intentions," he declared the jury acceptable. As an alternative ground for rejecting Booze's "informed and comparative rejection" argument, the Court of Special Appeals held that

his claim must fail "because he had not exhausted his peremptory challenges when the jury was seated and the case proceeded to trial." *Booze v. State, supra,* 111 Md.App. at 232, 681 A.2d at 545.

The alternative conclusion of the Court of Special Appeals was essentially one of non-prejudice—that, as Booze had not exhausted the peremptory challenges that he had, he was not prejudiced because he did not receive more of them or because he had used 10 before he had the full pool of prospective jurors before him. There have, indeed, been a number of cases in which this Court and the Court of Special Appeals have rejected complaints concerning the required use of peremptory challenges when the appellant failed to exhaust the challenges that he or she had. Those cases, and that concept of prejudice (or non-prejudice) have to be viewed in context, however. Whether an error is prejudicial depends, in most instances, on the particular factual setting in which the error occurs.

In *Parker v. State,* 227 Md. 468, 177 A.2d 426 (1962), the defendant complained that, after the State had exhausted its 10 peremptory challenges, it was permitted to withdraw its challenges to two prospective jurors and exercise them against two other jurors and that, as a result, he was forced to use two of his peremptory challenges to strike the jurors that earlier had been excused by the State. We found it unnecessary to determine whether the State could withdraw a peremptory challenge after its entire complement of them was exhausted because "the defendant (who had not exhausted his challenges) was not prejudiced." *Id.* at 471, 177 A.2d at 428.

A similar view was taken in *White v. State,* 300 Md. 719, 728, 481 A.2d 201, 205 (1984), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837, *reh'g denied,* 471 U.S. 1112, 105 S.Ct. 2351, 85 L.Ed.2d 866 (1985); *Thomas v. State,* 301 Md. 294, 310, 483 A.2d 6, 14–15 (1984), *vacated in part and remanded,* 325 Md. 160, 599 A.2d 1171, *rev'd after remand,* 328 Md. 541, 616 A.2d 365 (1992), *cert. denied,* 508 U.S. 917, 113 S.Ct. 2359, 124 L.Ed.2d 266 (1993); *Booth v. State,* 306

Md. 172, 185, 507 A.2d 1098, 1105 (1986) (*Booth II*), *vacated in part on other grounds*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied*, 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987); and *Mills v. State*, 310 Md. 33, 39–40, 527 A.2d 3, 6 (1987), *vacated on other grounds sub nom. Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In each of those cases, the defendant complained about the court's refusal to strike a juror for cause, thus requiring him to exercise one of his peremptory challenges to have the juror excused, and in each we noted that, because the defendant had not exhausted the peremptory challenges that he had, there was no reversible error, even if the juror should have been stricken for cause. *See also Bever v. State*, 4 Md.App. 436, 243 A.2d 634 (1968), *cert. denied*, 252 Md. 729 (1969); *McCree v. State*, 33 Md.App. 82, 363 A.2d 647 (1976); *Earhart v. State*, 48 Md.App. 695, 429 A.2d 557 (1981); *Thomas v. State*, 50 Md.App. 286, 437 A.2d 678 (1981), *cert. denied*, 292 Md. 639 (1982).

■ In those settings, a finding of no harm, and therefore no reversible error, is not only reasonable, but inescapable. A defendant cannot legitimately complain about having to use a peremptory challenge unnecessarily when, at the end of the process, he still had challenges unused.

■ The problem here is quite different. At the end of the process (with respect to the actual jury), Booze had one peremptory challenge left. The State, however, still had three left and Booze's co-defendant, Snead, had one. Booze points out that his saving of one challenge merely indicates that "he wanted to avoid the possibility of having a totally unacceptable juror seated and being without the ability to strike such a juror." Brief for Appellant at 19. Under the circumstances, that was, from his point of view, a reasonable fear. Although he might have found the next juror on the list more acceptable than one of the jurors already seated, he could not be certain that the State or Snead would accept that juror. Indeed, if he exercised his last challenge, he would be gambling on having any of the next five persons serve as a replacement, and he

would have no control over that selection. The withholding of one challenge to protect against that prospect does not, as in the situation noted above, eradicate the prejudice arising from the court's error.

JUDGMENT OF COURT OF SPECIAL APPEALS RE-VERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIR-CUIT COURT FOR BALTIMORE CITY AND TO RE-MAND FOR NEW TRIAL; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.